IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KARIN J. BLACK, individually and on behalf of the Classes, ) ) ) Plaintiff, ) ) v. ) ) JP MORGAN CHASE & CO.; BANK OF ) AMERICA CORPORATION; DISCOVER ) FINANCIAL SERVICES; EXPERIAN ) INFORMATION SOLUTIONS, INC.; ) TRANSUNION, LLC; EQUIFAX CREDIT ) INFORMATION SERVICES, INC.; ) FICO, LLC; and VANTAGESCORE ) SOLUTIONS, LLC, ) ) Defendants. ) | Civil Action No. JURY TRIAL DEMANDED |

## COMPLAINT

AND NOW comes Plaintiff, Karin J. Black, individually and on behalf of the Classes (as hereinafter defined), by and through her counsel, Matthew L. Kurzweg, Esq., C. Allen Black, Esq., and Kurzweg Law Offices, and files the following Complaint.

## INTRODUCTION

1. This action is brought by Plaintiff on behalf of all persons and entities that have paid inflated prices for consumer loans. As an integral part of and in furtherance of their unlawful conspiracy to fix and maintain prices, Defendants, representing the major consumer lenders and credit reporting bureaus, restrained the availability of consumer loans and engaged in conspiratorial and anti-competitive conduct to inflate and fix loan prices.

2. Defendants' conduct violates the Sherman Act. Plaintiff seeks an order enjoining the Defendants' anti-competitive conduct and damages for herself and the Classes (as hereinafter defined) as a result of the Defendants' unlawful conduct.

## PARTIES

3. Plaintiff Karin J. Black is a resident of McCandless Township, located in Allegheny County, Pennsylvania, and within the Western District of Pennsylvania. Plaintiff holds two credit cards issued by JP Morgan Chase & Co., two credit cards issued by Bank of America Corporation, and one credit card issued by Discover Financial Services. As a result of

Defendants' unlawful conduct alleged herein, Plaintiff has suffered injury in fact and paid artificially inflated prices for her loans with the stated banks and others.

4. Defendant JP Morgan Chase & Co. ("JP Morgan") is a corporation organized and existing under the laws of Delaware, with its headquarters and principal place of business located at 270 Park Avenue, New York, New York, 10017, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

5. Defendant Bank of America Corporation ("BOA") is a corporation organized and existing under the laws of Delaware, with its headquarters and principal place of business located at 100 North Tyron Street, Charlotte, North Carolina, 28280, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

6. Defendant Discover Financial Services ("Discover") is a corporation organized and existing under the laws of Delaware, with its headquarters and principal place of business located at 2500 Lake Cook Road, Riverwoods, Illinois, 60015, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

7. Defendant Experian Information Solutions, Inc. ("Experian") is a corporation organized and existing under the laws of Ohio, with its headquarters and principal place of business located at 505 City Parkway West, Orange, California, 92868, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

8. Defendant Transunion, LLC ("Transunion") is a limited liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business located at 555 West Adams, Chicago, Illinois, 60661, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

9. Defendant Equifax Credit Information Services, Inc. ("Equifax') is a corporation organized and existing under the laws of Georgia, with its headquarters and principal place of business located at 1600 Peachtree Street, Atlanta, Georgia, 30309, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

10. Defendant FICO, LLC ("FICO") is a limited liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business located at 901 Marquette Avenue, Suite 3200, Minneapolis, Minnesota, 55402, and doing business within the Western District of Pennsylvania and elsewhere in the United States.

11. Defendant VantageScore Solutions, LLC ("VantageScore") is a limited liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business located at 107 Elm Street, Stamford, Connecticut, 06902, and doing business within the Western District of Pennsylvania and elsewhere in the United States. VantageScore is co-owned by Transunion, Equifax, and Experian.

12. Defendants, directly or through a division, subsidiary or agent, have had actual knowledge of, and have knowingly participated in, the conspiracy to fix loan prices, including the restraint of availability of consumer loans.

13. The acts charged in this Complaint were authorized, ordered, and done by the officers, employees, agents, members or representatives while actively engaged in the management direction, control, or transaction of the business affairs of each of the Defendants.

## UNNAMED CO-CONSPIRATORS

14. Various other persons, firms, corporations, or joint ventures not named defendants in this lawsuit, the identities of which are presently unknown, may have participated as co-conspirators with each of the Defendants' illegal activities in this complaint and have performed acts and made statements in furtherance of the illegal combination and conspiracy.

## JURISDICTION AND VENUE

15. Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. This Court also has diversity jurisdiction over the Classes (as hereinafter defined) pursuant to 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action Fairness Act of 2005 because one or more members of the Classes are citizens of a State different from one or more Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

16. Venue is proper in the Western District of Pennsylvania pursuant to §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and U.S.C. § 1391 because Defendants transact business within this district, and because thousands of members of the Class reside in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will have, substantial anti-competitive effects within this district.

## TRADE AND COMMERCE

17. During the Class Period (as hereinafter defined), each of the Defendants, itself or through its affiliates, agents or subsidiaries, shared customer data among the Defendants and made loans in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States.

## RELEVANT MARKET

18. As to claims so requiring, the relevant product market for purposes of this action is the market for consumer credit. The relevant geographic market is the United States.

19. JP Morgan, BOA, and Discover are among the top lenders for consumer credit. The top ten lenders control 87.55% of consumer loans.

20. Experian, Transunion, and Equifax are the top three credit bureaus that control and store consumer lending information. Together, these credit bureaus store and control the credit data of over 85% of all debtors.

21. FICO and VantageScore are credit scoring companies that provide a "score" to lenders which is used to price consumer loans. Together, FICO and VantageScore provide over 85% of the credit scores to lenders in the United States.

## FACTUAL BACKGROUND

22. Defendants loan money to consumers throughout the United States and/or share data on such loans.

23. There has been no or only marginal growth of consumer lending in the last five years indicating that the market is currently saturated. Therefore, it is increasingly unlikely that the lenders can increase profits by adding new consumers.

24. Necessarily, a saturated market should logically increase competition among lenders to offer lower rate loans in order to claim larger market share. However, since 2007, market share has not shifted more than two percent among competitors, indicating at least a *de facto* market allocation.

25. Further, in light of the current recession, interest rates offered by lenders for consumer loans should rationally decrease in order to retain current customers, prevent defaults, and increase market share by attracting new customers. However, interest rates have actually increased in the economic downturn. Such increased profit taking during an economic downturn would be irrational in a competitive marketplace. Instead, through collusion and sharing of competitively sensitive consumer data, lenders have artificially increased the price of consumer loans.

26. In a freely competitive marketplace, debtors should have access to lower cost loans especially if they are still employed since they are low default risks. Moreover, debtors who are experiencing financial hardship should have access to loan forbearance, where the only factor in their inability to pay is loss of a job, but a clear history of timely payments. Instead, lenders have used their near complete monopoly to increase prices for the low risk debtors, and accelerate default of debtors in distress in order to exclude them from seeking non-monopolistic loan terms.

27. Defendants engage in cartel behavior because they all share their customer data in a *quid pro quo* arrangement among themselves to set higher prices by reporting to and utilizing credit bureaus to distribute information. The nature of the arrangement conceals the agreements among competitors for manipulating prices. Specifically, in a competitive industry, customer data is considered propriety and closely guarded by trade secret law because such data provides a competitive advantage, for example, identifying customers that are the most lucrative and low-risk. Consumer credit histories are competitively sensitive because they include information such as balances owed, credit lines offered, interest rates offered, extent of credit debt, product purchasing history, and payment history for each of the lender's customers.

28. There is no economically rational reason why a lender would inform other competitors about who are "good" customers and who are "bad" customers because rationally competitive lenders would then attempt to "steal" the good customers with offers of lower interest rates. In fact, in a competitive marketplace, the ability to retain good customers with lower rate loans, lower fees, and other incentives would be a decisive competitive advantage over other lenders. Thus, a rational lender would attempt to retain the profitable customers while disengaging the bad customers, while keeping such data secret from competitors.

29. In opposition to a competitive marketplace, lenders not only share information on their customers, but derive large profits from submitting the data to competitors. In order to consolidate and distribute the vast amount of consumer data, an oligopoly of three credit bureaus and two credit scoring companies have emerged as the most efficient method for highly centralized, rapid distribution of competitively sensitive data among competitors.

30. Although some of the data collected by credit bureaus is publically available, the majority of the data is collected from lenders' private records.

31. Sharing of this data results in supra-competitive pricing because once a single competitor reports a negative event or a high balance, all lenders are immediately notified, so that all lenders can raise rates and adjust credit in unison, resulting in cartel pricing.

32. Because credit reporting agencies use private and sensitive data among marketplace competitors, they act as market associations within the context of antitrust law because they actively promote and derive profit from assisting all of the competitors in the industry.

33. Market associations can be effective tools for monopolizing industries by acting as an information clearing house for coordinating pricing information and boycotts. Credit bureaus act as information clearing houses holding proprietary data on over 1 billion debtors internationally.

34. Credit bureaus further the price fixing scheme among lenders because they assist and promote parallel action among competitors. Specifically, where one company reports a negative event, the credit bureau(s) alert all of the lenders to either boycott the debtor by foreclosing access to any further loans or increase interest rates. Thus, consumers are forced to either submit to higher monopolistic prices or default and thereby be excluded from the credit market for at least seven years.

35. Credit bureaus also assist in providing instantaneous real-time monopolistic pricing. Because the database information is shared in real time, the lenders can increase prices or institute boycotts with unparalleled efficiency.

36. Furthering the conspiracy, credit scoring companies use the reported information from credit bureaus to create a derivative score which incorporates all of the consumer's credit data as

well as the consumer's profitability. This score is then distributed to all lenders. The lending industry has identified that the most profitable customers are the ones having the lower credit scores. Consequently, by examining credit scores, lenders can rapidly identify the most profitable customers and fix rates accordingly. Thus, credit scoring companies assist lenders in effecting a parallel pricing scheme for credit by creating a derivative metric which is an effective proxy for setting uniform price points among competitors.

37. Defendants may argue that by sharing data the lending risk is decreased. However, this is not true. First, lenders can purchase default insurance and pass this cost onto the customers, thus effectively reducing lending risk to zero. Second, default rates are easily predictable based on historical default rates. For example, from 2007 to 2008, the default rate remained at 10%. Thus, even if the lenders had not purchased insurance, they could still effectively incorporate the expected default rate into loan price and distribute it over the entire population of loans.

38. Instead, in order to achieve perfect pricing where the consumers are singled out to pay the highest price they can possibly afford, the customers are allocated into particular risk groups where the higher risk groups are charged more interest ostensibly because the lenders are taking more risk. However, because the availability of insurance and default rate predictability virtually eliminate this risk, the price represents monopolistic profit, not risk allocation.

39. As further evidence that lenders do not actually take any significant risks, none of the lenders return the excess interest collected if a person does not default. Thus, where it is clear that the lender "mistakenly" assesses a person as likely to default, but that person does not default, the "mistake" accrues to the lender's benefit. Such monopolistic profits thus motivate lenders to report negative events on their own customers in order decrease the credit rating and thereby increase the number of customers paying at the "high-risk" rate, increasing supra-competitive pricing even further.

40. As further evidence that the credit score is not used to assess risk, but rather fix and manipulate pricing, credit scores are actually lowered when consumers pay off credit cards, even though such an act actually reduces credit risk. The common industry explanation for this practice is that the debt/utilization ratio indicates that these consumers are not as profitable when they reduce their risk of default. Such inverted pricing is irrational in a competitive marketplace because such consumers represent the lowest default risk of all and should be the most sought after customers.

41. In a rational market place, consumers that retain one card after paying off another one would be an asset to the remaining lender(s) because competition with the other lenders has been reduced. Thus, it would be irrational to punish the consumer by raising rates on the remaining cards, unless the market was controlled.

42. However, increasing the interest rate on low risk consumers makes sense in a conspiracy because the remaining lenders are punishing the consumers who drop out of the monopolistic pricing system. Thus, the only way to avoid punishment is to obtain and maintain credit that a consumer does not need and, as a consequence, pay monopolistic prices simply to preserve a good credit score. Thus, the argument that a credit score indicates "risk" is circular because the lenders control both the credit score by reporting to the credit bureaus and then make lending decisions based on the very credit score that they in part control.

43. Defendants have also schemed to restrain trade by creating pricing floors. First, all consumer lenders provide loans at a variable interest rate tied to the prime lending rate. Thus, the prime lending rate is a pricing floor which no lender will ever price below, creating a price baseline. However, in a competitive market place fixed rate loans would be normative since a lender would be willing to bear the risk of a fluctuating marketplace in order to secure customers who are good credit risks. Second, the price floor baseline is elevated for customers based on the shared credit information, allowing competitors to coordinate pricing beyond the baseline rate.

44. Defendants have additionally colluded to charge monopolistic punitive fees for exceeding the card credit limit, late payments, and various other consumer actions. Although Defendants may argue that the fee pricing acts as a deterrent to late payments, the argument is disingenuous because all of the lenders derive high profits from such fees. The high profits from fees motivate lenders to encourage consumers to err rather than to have them pay in a timely manner. This action would be irrational in a competitive marketplace because the punitive fees increase the likelihood of a default or switching balances to a competitor offering lower of no fees. However, since all of the consumer data is shared among creditors, the assessment of penalty fees is used to notify the competition that the customer's rate prices can be increased to higher levels. Thus, assessing fees is another method of exacting monopolistic profits because such data is shared among competitors.

45. Defendants have further attempted to obtain supra-competitive prices by incorporating under the laws of states where there is no upper limit on loan terms (i.e. usury laws). In the United States, 23 states and the District of Columbia have legislated usury laws. Usury is a form of monopolistic pricing because the market place is not competing for the consumer's debt. The overt act of forum shopping to avoid usury laws is thus indicative of a monopolistic pricing scheme which would have been hampered by such laws.

46. Although the Supreme Court decision *Marquette v. First Omaha Service Corp.* allowed lenders to set interest rates and fees according to local state law, it did not provide a safe harbor to thereby charge monopolistic interest rates. In a competitive market place interest rates would almost never naturally exceed any state usury law because the state banks that charge the lower rate would be more attractive to consumers. Moreover, default insurance

would cover loans from either national or state chartered banks so there would be no disparity in lending risk.

47. However, competition between state banks with lower interest rates and/or no fees and national banks charging monopolistic rates is effectively foreclosed where lending decisions are made based on the credit scores which are a product of the national bank's customer data sharing scheme. Specifically, by manipulating credit scores through onerous contract terms that encourage consumers to err at least once in their credit history, and, by encouraging default over reconciliation and by other collusive behavior, the national banks are able to charge the monopolistic rates, and not rates that would be seen in a competitive marketplace. Specifically, by sharing ostensibly "negative" data with competitors, national banks notify competitors not to do business with the consumer and/or invite the co-conspirators to charge higher rates and fees to the customer.

48. Defendants have intentionally increased consumer loan default rates beyond that of a competitive market place. Specifically, if a debtor loses his or her job and cannot pay, but is actively seeking employment, an economically rational lender would be motivated to forbear the debt until it can be repaid, or offer a lower rate which although less profitable, is not a loss. However, because the debt is insurable and operates a tax write off, the lending companies prefer placing the loan in default in order to the lower the credit score and, thus, make it impossible for a consumer to repay or refinance the loan with less onerous terms. Lenders know that lowering interest and fee rates would decrease default rates but would also have disastrous consequences if the consumers paying the monopolistic prices demanded similar rates.

49. Defendants effectively boycott those consumers who are not able to pay monopolistic prices because a defaulting debtor's credit rating is dropped enough to freeze the consumer out of the credit market for at least seven years - the length of time a negative report can remain on a credit report under the Fair Credit Reporting Act. Thus, lenders' customers are never placed in a position to negotiate a lower rate, effectively punishing debtors who are otherwise still employable and still good credit risks, but have experienced temporary hardship.

50. Defendants engage in a "take it or leave it" proposition for consumers submitting to monopolistic pricing or being denied credit, contrary to competitive market forces because Defendants know that a competitor will not lend money at a lower rate once that lender has decreased the credit score of the consumer. Such contracts of adhesion are a hallmark of a non-competitive marketplace and indicative of a boycott of customers who cannot afford to pay the inflated monopolistic prices.

51. In order to further the conspiracy, private customer data is made available to potential employers of debtors. In a competitive marketplace, such data would be closely guarded since the ability to find employment directly affects the ability of the debtor to repay the

loans.  Thus, the reporting of negative credit data to potential employers would not appear to be in the financial interest of the lender.  However, in the conspiracy, the reporting of competitively sensitive data to third parties is used to guarantee monopolistic rates because debtors are terrorized into paying whatever rates are demanded because debtor's livelihoods are put at stake when repaying consumer credit loans.  Although "consent" must be obtained to share such data with third parties, it is obtained *ad terrorem* and results in antitrust injury.  Thus, lenders not only have protection against default though insurance, but a powerful method of extracting the highest possible prices from consumers.   Such tying of employability to lender managed credit scores thus decreases the risk that customers will not pay monopolistic rates.

52. Defendants have protected their supra-competitive prices, instituted boycotts, promoted tying arrangements, and allocated customers by various unlawful means.  But for their anticompetitive conduct, consumers would have paid less for consumer loans and/or been able to avoid default and bankruptcy.  The lenders have acted collectively to increase the interest rates and fees and thereby exact monopolistic prices from consumers by means of sharing economically sensitive data.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action on behalf of herself, and all others similarly situated, pursuant to Rule 23(b) (2) and (3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to represent the following classes (collectively "Classes"):

    i) **"Injunctive Relief Class":** All persons or entities in the United States (excluding federal, state, and local governmental entities, Defendants, their directors, officers and members of their families) that obtained consumer loans sold by Defendants.

    ii) **"End Purchaser Loan Damages Class":** All persons or entities in the United States (excluding federal, state, and local governmental entities, Defendants, their directors, officers and members of their families) that obtained loans sold by Defendants from January 1951 through the conclusion of the trial of this matter ("Class Period").

    iii) **"End Purchaser Credit Reporting Class":** All persons or entities in the United States (excluding federal, state, and local governmental entities, Defendants, their directors, officers and members of their families) that had their loan information shared among Defendants during the Class Period.

54. Excluded from each of the Classes are Defendants, their directors, officers and members of their families; any entity which any Defendant owns, controls or has controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of any Defendant; and any federal, state or local governmental entity

55. The Classes are so numerous that joinder of all members is impracticable.  There are millions of members of the Classes who are geographically dispersed throughout the United States.

56. Plaintiff's claims are typical of the claims of the members of the Classes because Plaintiff and all Class members were damaged by the same wrongful conduct of the Defendants alleged herein.

57. There are questions of law and fact common to the Classes which predominate over any questions affecting only individual Class members. Such common questions include:

   i) Whether Defendants violated the Sherman Act by engaging in a continuing combination and conspiracy to: restrain the availability consumer loans and fix and maintain the prices for such loans;

   ii) The duration and extent of any such conspiracy or combination alleged;

   iii) Whether Defendants and each of them were participants in any such combination or conspiracy alleged herein;

   iv) Whether Defendants fixed the price of loans at supracompetitive levels;

   v) Whether Defendants fixed price floors for consumer loans;

   vi) Whether Defendants used sensitive competitive data to effect parallel pricing schemes and promote tying arrangements;

   vii) Whether Defendants' conduct caused damage to Plaintiff and members of the Classes, and if so, the appropriate measure of such damages.

58. The claims of the Plaintiff are typical of the claims of the Classes, and Plaintiff has no interest adverse to the interest of other members of the Classes.

59. Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel competent in the prosecution of complex class actions and antitrust litigation.

60. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford to individually litigate an antitrust claim against Defendants. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

61. Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect of the Class as a whole.

# COUNT I
### For Violation of Section 1 of the Sherman Act
### (On Behalf of All Classes)

62. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above. This Count is brought pursuant to 15 U.S.C. §1 and 15 U.S.C. §16, for injunctive relief as to all Classes.

63. The consumer lending industry is dominated by 10 entities: JPMorgan, BOA, Discover, and non-parties Citi, American Express, Capital One, Wells Fargo, HSBC, U.S. Bank, and USAA Savings.

64. The credit reporting industry is dominated by three companies, Transunion, Experian, and Equifax.

65. The credit scoring industry is dominated by two companies, FICO and VantageScore.

66. The consumer lending market is also characterized by high barriers to entry to new firms, thus enhancing Defendants' significant market power. The high degree of concentration in the industry and the significant barriers to entry has insulated Defendants from price competition.

67. Beginning at least in 1951, the exact date being unknown, Defendants and their co-conspirators have engaged in a continuing combination, conspiracy and common course of conduct in unreasonable restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.  As more fully described herein, the combination, conspiracy and common course of conduct including sharing of proprietary consumer information engaged in by the Defendants consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to restrain the availability of consumer loans and then fix and maintain at artificially high and non-competitive levels the prices at which they made loans, as well as nationally boycott consumers unable or unwilling to pay monopolistic prices.  As a result of the conspiracy, combination and common course of conduct and despite increased risk of default in the current economy, Defendants have maintained and even increased lending costs at supracompetitive levels.

68. Pursuant to their combination, conspiracy, and concerted action, Defendants have adopted and adhered to virtually identical and parallel methods of pricing (including price floors, accelerated default, punitive fees, tying, and lockstep pricing).  Defendants collectively represent the pivotal and controlling factor in consumer lending in the United States.

69. Currently Defendants rate credit worthiness and set prices for consumer debt for at least the prime rate and on average at 14%, which is twice the rate of lending in other markets including home and business loans, with higher consumer rates exceeding 30%.  Such prices are only possible through the sharing of competitively sensitive credit histories and real time adjustment of pricing based on shared credit data.

70. During the Class Period, each Defendant took actions to restrain the availability of consumer credit and fix the prices for consumer lending. Pursuant to the combination, conspiracy, and concerted action, Defendants have consistently adopted and adhered to coordinated parallel-pricing schemes and boycotts.

71. Defendants also continue to use credit reporting agencies and credit scoring agencies to restrain and control the price of consumer loans. Included in the agencies' contracts with lenders is a *quid pro quo* arrangement to share otherwise private data among competitors. As an incentive to share data, the credit reporting agencies pay lenders for their data. In addition, non-reporting lenders are penalized by foreclosing access to the group data in order to ensure compliance with the monopolistic pricing scheme.

72. JP Morgan has used competitively sensitive information obtained from other yet to be identified lenders to set prices, foreclose credit lines, and accelerate default as evidenced by the letter sent to Plaintiff indicating that the change in position on her credit line was not due to independent market factors, but rather cooperation, understanding, and agreement among competitors. See Exhibit A.

73. Unlike the antitrust exemptions for insurance companies under the McCarran-Ferguson Act, which allow insurers to share loss data with each other without being hailed into federal court on antitrust or collusion charges, lenders do not have similar protection for sharing customer data. As such, no such safe harbor or exemption to antitrust laws exists for the lending industry.

74. The fact that Congress has specifically identified the act of sharing loss data among competitors in the insurance industry as violative of the antitrust provisions absent passage of an exemption operates as evidence that Defendants and their co-conspirators are violating antitrust provisions by the actions alleged herein.

75. The agreement among competitors in the lenders' market to share pricing data in the form of credit reports, which are used to coordinate and fix prices as well as promote boycotts is a *per se* violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court declare, adjudge and decree the following:

i) That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief, and declaring Plaintiff as representative of the Classes and her counsel as counsel for the Classes;

ii) That the conduct alleged herein constitutes an unlawful contract, combination or conspiracy to restrain trade and fix and maintain prices in violation of Section 1 of the Sherman Act;

iii) That Plaintiff and the Classes are entitled to any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

iv) That Defendants disgorge money illegally obtained from the classes as a result of the unlawful activities and that members of the Classes are entitled to restitution.

v) That Plaintiff and each member of the Classes are entitled to the amounts by which the Defendants have been unjustly enriched;

vi) That Defendants are enjoined from continuing the illegal activities alleged herein;

vii) That Defendants are specifically enjoined from sharing their customer data among themselves and their agencies, thus terminating the conspiracy and preventing further injury;

viii) That Plaintiff and the Classes recover their costs of this suit, including reasonable attorneys' fees and expenses as provided by law; and

ix) That Plaintiff and the Classes are granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: June 24, 2010                                                                 Respectfully Submitted,

KURZWEG LAW OFFICES

 /s/ Matthew L. Kurzweg
Matthew L. Kurzweg, Esq.
Pa. I.D. No. 76462

 /s/ C. Allen Black, Jr.
C. Allen Black, Jr., Esq.
Pa. I.D. No. 202501

945 Liberty Avenue
5th Floor Bruno Building
Pittsburgh, PA  15222
(412) 258-2223
(412) 258-2224 (Fax)

Attorneys for Plaintiff Karin J. Black, individually, and on behalf of the Classes

Case 2:10-cv-00848-LPL   Document 1   Filed 06/24/10   Page 14 of 14