**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KARIN J. BLACK, individually and on behalf of the Classes, | ) ) | |
| | ) | Civil Action No. 10-848 |
| Plaintiff, | ) | |
| | ) | Judge David Stewart Cercone |
| v. | ) | Chief Magistrate Judge Lisa |
| | ) | Pupo Lenihan |
| JP MORGAN CHASE & CO., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | ECF Nos. 32, 36, 39 & 42 |
| | ) | |

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

It is respectfully recommended that the Motion of Defendants JP Morgan Chase & Co. and Bank of America Corporation to Dismiss the Complaint (ECF No. 32) be granted with prejudice. It is further recommended that the Motion of Defendant Fair Isaac Corporation to Dismiss the Complaint (ECF No. 36) be granted with prejudice. It is further recommended that the Motion of Defendant VantageScore Solutions LLC to Dismiss the Complaint (ECF No. 39) be granted with prejudice. It is further recommended that the Motion of Defendants Trans Union, Experian and Equifax to Dismiss the Complaint (ECF No. 42) be granted with prejudice.[1]

In addition, although not separately filed, Plaintiff requested leave to file an amended complaint in her opposition briefs to each of the above motions. It is respectfully recommended that those requests be denied. It is further recommended that Plaintiff's request for jurisdictional

---

[1] The Motion to Compel Arbitration or, in the alternative, Motion to Dismiss the Complaint filed by Discover Financial Services, Inc. (ECF No. 28), will be considered and ruled on in a separately filed Report and Recommendation.

discovery, lodged in her opposition brief to VantageScore Solutions LLC's motion to dismiss, also be denied.

II. **REPORT**

A. **Background and Procedural History**

Plaintiff, Karin Black, has filed a purported class action complaint, alleging that the Defendants violated the Sherman Act, 15 U.S.C. §1. Generally, Black alleges that the Defendants—consumer lenders ("Lenders"), credit reporting agencies ("Credit Bureaus") and credit scoring companies ("Scoring Cos.")—conspired to restrain the availability of consumer loans and inflate or fix the price of that credit by sharing credit history information. Plaintiff also alleges a national boycott of consumers who are unable or unwilling to pay monopolistic prices. (Compl. ¶ 67.)

The Defendant Lenders in this case consist of JP Morgan Chase & Co. ("JP Morgan"), Bank of America Corporation ("BOA"), and Discover Financial Services, Inc. ("Discover"). The Defendant Credit Bureaus consist of Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and Equifax Credit Information Services, Inc., ("Equifax"). The Scoring Cos. named as Defendants consist of FICO, LLC ("FICO") and VantageScore Solutions, LLC ("VantageScore").

Black commenced this action on behalf of herself and three purported classes of individuals: (1) the "Injunctive Relief Class" – all U.S. persons or entities that obtained consumer loans sold by Defendants; (2) "End Purchaser Loan Damages Class" – all U.S. persons or entities that obtained loans sold by Defendants from January 1951 through the conclusion of the trial in this matter ("Class Period"); and (3) "End Purchaser Credit Reporting Class" – all U.S. persons or entities that had their loan information shared among Defendants during the

Class Period (collectively, the "Classes"). She seeks an order declaring that this action be maintained as a class action and declaring Plaintiff as representative of the Classes and her counsel as counsel for the Classes; an order enjoining the Defendants' anti-competitive conduct; and an award of damages for herself and the Classes.

Black invokes this Court's subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§1331 and 1337. She maintains that venue lays in this district under 15 U.S.C. §§15,[2] 22,[3] and 26,[4] and 28 U.S.C. § 1391, because Defendants transact business within this district, thousands of members of the Class reside in this district, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district, and the acts complained of have had, and will have, substantial anti-competitive effects within this district. (Compl. ¶16.)

In response to the Complaint, Defendants have filed several motions to dismiss under Fed.R.Civ.P. 12(b)(6), arguing that under *Twombly* and its progeny, Plaintiff has failed to allege sufficient facts to show that her antitrust claims against Defendants are plausible. In addition, Defendant VantageScore seeks dismissal of the complaint against it on the basis that this Court lacks personal jurisdiction over it. The motions have been fully briefed and responded to. On

---

[2] 15 U.S.C. §15(a) provides in relevant part: " . . . any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, . . .."
[3] Section 22 provides: "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. §22.
[4] Section 26 does not confer venue in this district, but rather, provides that a "person . . . shall be entitled to sue for and have injunctive relief, *in any court of the United States having jurisdiction over the parties,* . . .." 15 U.S.C. §26.

February 10, 2011, the Court held oral argument on all of the pending motions. Thus, the motions are ripe for disposition.

**B.**      <u>**Legal Standard – Motion to Dismiss Under Fed.R.Civ.P. 12(b)(6)**</u>

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993). A complaint must be dismissed for failure to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1960 (May 18, 2009) (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal* at 1949 (citing *Twombly* at 556). The Supreme Court further explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly* at 556-57). The court of appeals has expounded on this standard in light of its decision in *Phillips v. County of Allegheny,* 515 F.3d 224 (3d Cir. 2008) (construing *Twombly* in a civil rights context), and the Supreme Court's recent decision in *Iqbal*:

> After *Iqbal,* it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1948. The Supreme Court's ruling in *Iqbal* emphasizes

that a plaintiff must show that the allegations of his or her complaints are plausible. *See Id.* at 1949-50; *see also Twombly,* 505 U.S. at 555, & n. 3.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). In light of *Iqbal*, the *Fowler* court then set forth a two-prong test to be applied by the district courts in deciding motions to dismiss for failure to state a claim. First, the district court must accept all well-pleaded facts as true and discard any legal conclusions contained in the complaint. *Fowler,* 578 F.3d at 210-11. Next, the court must consider whether the facts alleged in the Complaint sufficiently demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. To survive a motion to dismiss, a complaint must show an entitlement to relief through its facts. *Id.* (citing *Phillips* at 234-35).

Courts generally consider only the allegations of the complaint, its attached exhibits, and matters of public record in deciding motions to dismiss. *Pension Benefit Guar. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Factual allegations within documents described or identified in the complaint may also be weighed if the plaintiff's claims are based upon those documents. *Id.* (citations omitted). A district court may consult those documents without converting a motion to dismiss into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

C.    **The Complaint**

For purposes of the motion to dismiss, the Court assumes all factual allegations to be true. Many of the allegations in Plaintiff's Complaint, however, are conclusory, and therefore, will not be considered here.[5]

_____

[5] In addition, the Court notes that throughout the complaint, Black continuously refers to "Defendants" without differentiating between which of the Defendants or categories of Defendants allegedly engaged in the specific conduct. It cannot be assumed that all of the Defendants engaged in all of the alleged conduct given that there are distinct differences in their businesses. The Court further notes that many of Plaintiff's allegations do not describe conduct engaged in specifically by the named Defendants in this

It appears that the focus of Plaintiff's Complaint is on consumer credit card lending, as Black alleges that she holds credit cards issued by JP Morgan, BOA, and Discover.[6] (Compl., ¶3.) Plaintiff asserts that Defendants JP Morgan, BOA and Discover are among the top ten consumer credit lenders in the United States, and together the top ten lenders control 87.55% of consumer loans.[7] (¶19.) Plaintiff further alleges that Defendants Trans Union, Experian and Equifax constitute the top three credit bureaus that control and store consumer lending information. (Compl. ¶ 20.) Plaintiff contends that together, these Credit Bureaus store and control the credit data of over 85% of all debtors. (*Id.*) According to Plaintiff, Defendants FICO and VantageScore are credit scoring companies that provide a "score" to lenders which is used to price consumer loans, and together they provide over 85% of the credit scores to lenders in the United States. (Compl., ¶21.)

Plaintiff alleges that there has been no or only marginal growth of consumer lending in the last five years. (Compl., ¶23.) According to Plaintiff, since 2007, market share has not shifted more than two percent among competitors. (Compl., ¶ 24.) However, Plaintiff contends interest rates have actually increased in the economic downturn. (Compl., ¶25.)

Plaintiff also alleges that Defendants loan money to consumers throughout the United States and/or share data on such loans. (Compl. ¶ 22.) In addition, Plaintiff alleges that Defendants share their customer data among themselves to set higher prices by reporting and

---

action, but rather, are stated in more theoretical terms, describing generally conduct engaged in by all consumer lenders, credit bureaus and credit scoring companies. With these caveats in mind, the Court turns to the factual allegations in the Complaint.

[6] Plaintiff does not allege that she holds or held any other type of consumer loan with the Lenders, such as a home mortgage loan or home equity loan or line of credit, and she distinguishes interest rates for consumer lending from interest rates on "lending in other markets including home and business loans." (Compl., ¶ 69.)

[7] According to Plaintiff, the other entities making the list of top ten consumer lenders are Citi, American

utilizing credit bureaus to distribute information, and derive large profits from submitting the data to competitors. (Compl., ¶¶ 27, 29.) Customer data, such as consumer credit histories, includes information such as balances owed, credit lines offered, interest rates offered, extent of credit debt, product purchasing history, and payment history for each of the lender's customers. (Compl., ¶27.)

According to Plaintiff, although some of the data collected by credit bureaus is publically available, the majority of the data is collected from lenders' private records. (Compl., ¶ 30.) Plaintiff contends that once a single competitor reports a negative event or a high balance, all lenders are immediately notified, so that all lenders can raise rates and adjust credit in unison. (Compl., ¶ 31.) Credit reporting agencies use private and sensitive data among marketplace competitors and they actively promote and derive profit from assisting all of the competitors in the industry. (Compl., ¶ 32.) Credit bureaus act as information clearing houses holding proprietary data on over 1 billion debtors internationally. (Compl., ¶ 33.) Consumers who choose default over paying higher interest rates are excluded from the credit market for at least seven years. (Compl., ¶ 34.) Credit bureaus also assist in the setting of higher prices by sharing database information in real-time. (Compl., ¶ 35.)

Credit scoring companies use the reported information from credit bureaus to create a derivative score which incorporates all of the consumer's credit data as well as the consumer's profitability. (Compl., ¶ 36.) This score is then distributed to all lenders, who use the scores to identify the most profitable customers and fix rates accordingly. (*Id.*) Customers are allocated into particular risk groups. The higher risk groups are charged more interest ostensibly because the lenders are taking more risk. The availability of insurance and predictability of default rate

Express, Capital One, Wells Fargo, HSBC, U.S. Bank, and USAA Savings. (Compl., ¶ 63.)

virtually eliminate this risk.  (Compl., ¶38.)   Credit scores are actually lowered when consumers pay off credit cards, even though credit risk is reduced by the pay off.  (Compl., ¶40.)

All consumer lenders provide loans at a variable interest rate tied to the prime lending rate.  (Compl., ¶ 43.)  The prime lending rate is a pricing floor which no lender will ever price below, creating a pricing baseline.  (*Id.*)   The pricing floor baseline is elevated for customers based on the shared credit information.  (*Id.*)  Defendants rate creditworthiness and set prices for consumer debt for at least the prime rate and on average at 14%, which is twice the rate of lending in other markets including home and business loans, with higher consumer rates exceeding 30%.   (Compl., ¶ 69.)

Defendants charge penalty fees for various consumer actions such as exceeding the card credit limit or late payments.  (Compl., ¶ 44.)  Because consumer data is shared among creditors, the assessment of penalty fees is used to notify the competition that the customer's rate prices can be increased to higher levels.  (*Id.*)  Defendants have further attempted to obtain supra-competitive prices by incorporating under the laws of states where there are no usury laws, *i.e.,* no upper limit on loan terms.  (Compl., ¶ 45.)

On May 5, 2009, JP Morgan sent Plaintiff two letters regarding her two accounts.  (Ex. A to Am. Compl., ECF No. 1-2.)  In these letters, JP Morgan notified Plaintiff that it was reducing the credit limit on one of her business accounts, and decreasing the credit line on her other account. (*Id.*)   JP Morgan further indicated in the letters that its reasons for the decision to decrease Plaintiff's credit limit/line were:   "Balance owed on revolving accts too high" and "[c]urrent loan amount on all open accounts." *Id.* With regard to the decrease in her credit line, JP Morgan provided the additional explanation "[s]ufficient credit available with us." *Id.*   The letters go on to explain:  "This decision was based in whole or in part on information provided by

the reporting agency noted below. Other than providing information, this agency played no part in our decision. . . ." *Id.* The reporting agency identified in the May 5, 2009 letters is Equifax. *Id.*

### D. JP Morgan & BOA's Motion to Dismiss

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants JP Morgan and BOA ("Lenders") move to dismiss the Complaint with prejudice, claiming that Black has failed to plead sufficient facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.[8] The crux of Black's complaint against the Lender Defendants is that they conspired in violation of Section 1 of the Sherman Act to restrain the availability of consumer credit and to inflate or fix the price of that credit by sharing credit history information.

Section 1 of the Sherman Act makes illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. §1. Moreover, the Supreme Court has repeatedly held that §1 prohibits only unreasonable restraints of trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 885 (2007) (citing *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)). Thus, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy,' *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express,' *Theatre Enterprises*, 346 U.S., at 540, 74 S.Ct. 257." *Twombly,* 550 U.S. at 553.

---

[8]Defendants Experian, Trans Union, Equifax, VantageScore and FICO join in the motion to dismiss and supporting brief filed by Defendants JPMorgan and BOA and incorporate their arguments by reference.

In determining whether a practice restrains trade in violation of §1, a court will apply one of two standards, depending on the nature of the alleged violation: (1) A *per se* rule or (2) the rule of reason. *See Leegin,* 551 U.S. at 885-86. The accepted standard for determining whether a business practice restrains trade in violation of §1 is the rule of reason. *Leegin,* 551 U.S. at 885 (citing *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006)). Under this standard, a court must "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Kahn,* 522 U.S. at 10; *see also Leegin,* 551 U.S. at 885 (citing *Kahn, supra*). Another significant consideration is whether the businesses involved have market power. *Leegin,* 551 U.S. at 885-86 (citations omitted). By way of example, the rule of reason standard has been applied to vertical agreements, *i.e.,* "allegations of agreements between entities at different market levels that restrain trade[.]" *Kasada, Inc. v. Access Capital, Inc.,* No. 01 Civ. 8893 (GBD), 2004 WL 2903776, at *4 (S.D.N.Y. Dec. 14, 2004) (citing *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.,* 129 F.3d 240, 243 (2d Cir. 1997) ("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.")).

In applying the rule of reason analysis, the United States Court of Appeals for the Third Circuit has articulated four elements that an antitrust plaintiff asserting a §1 claim must prove: "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and conduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that

conspiracy."[9] *In re Baby Food Antitrust Litigation,* 166 F.3d 112, 118 (3d Cir. 1999) (citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1541 (3d Cir.1990)) (footnote omitted); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 253 (3d Cir. 2010) (quoting *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir.2005)).

On the other hand, the *per se* rule applies to a narrow category of restraints that "have such predictable and pernicious anticompetitive effect, and such limited potential for precompetitive benefit that they are deemed unlawful *per se.*" *Khan,* 522 U.S. at 10. For example, horizontal restraints, *i.e.,* agreements between competitors at the same level of market structure, such as price fixing agreements and group boycotts, have been deemed to be unlawful *per se* by the Supreme Court. *Kasada,* 2004 WL 2903776, at *4 (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212 (1959) (finding group boycotts unreasonable *per se*); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940) (finding price fixing unreasonable *per se*); *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir. 1976) (finding that group boycott is unreasonable *per se* due to its inherently anticompetitive nature, and therefore, always illegal)). Because of the *per se* rule's limited application, the Supreme Court has provided the following guidance on when to apply it:

> Resort to *per se* rules is confined to restraints . . . "that would always or almost always tend to restrict competition and decrease output." *Business Electronics, supra*, at 723, 108 S.Ct. 1515 (internal quotation marks omitted). To justify a *per se* prohibition a restraint must have "manifestly anticompetitive" effects, *GTE Sylvania, supra*, at 50, 97 S.Ct. 2549, and "lack ... any redeeming virtue," *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (internal quotation marks omitted).

> As a consequence, the *per se* rule is appropriate only after courts

---

[9] For purposes of the pending motions to dismiss, only the first and third elements are at issue.

have had considerable experience with the type of restraint at issue, see *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason, see *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). It should come as no surprise, then, that "we have expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Khan, supra*, at 10, 118 S.Ct. 275 (internal quotation marks omitted); see also *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (refusing to adopt a *per se* rule for a vertical nonprice restraint because of the uncertainty concerning whether this type of restraint satisfied the demanding standards necessary to apply a *per se* rule). And, as we have stated, a "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *GTE Sylvania, supra*, at 58-59, 97 S.Ct. 2549.

*Leegin*, 551 U.S. at 886-87.

In the situation where the evidence consists of mere exchanges of information, the presumption that price fixing agreements are *per se* unlawful disappears. *In re Baby Food Antitrust Litig.,* 166 F.3d at 118 (citing *United States v. U.S. Gypsom Co.,* 438 U.S. 422, 441 n. 16 (1978)). "Exchanges of information are not considered a *per se* violation because 'such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.'" *Id.* (quoting *Gypsom, supra*). Consequently, courts will evaluate such exchanges of information under a rule of reason analysis. *Id.*

In the case at bar, Plaintiff appears to be proceeding under the *pro se* rule, as she alleges in her complaint that "[t]he agreement among competitors in the lenders' market to share pricing data in the form of credit reports, which are used to coordinate and fix prices as well as promote boycotts is a *per se* violation of the Sherman Antitrust Act, 15 U.S.C. §1." (Compl. ¶75.)

However, the alleged conspiracy between the Lenders, Credit Bureaus and Credit Scoring Companies involves a vertical non-price constraint, and therefore, it is questionable whether the demanding standards necessary to apply the *per se* rule can be met.

Regardless of whether Plaintiff's claim is evaluated under the *per se* rule or the rule of reason, an essential element of her antitrust claim is that there was an unlawful agreement, or conspiracy, among the Defendants. On this point, the court of appeals has opined:

> "[t]he very essence of a section 1 claim ... is the existence of an agreement," because "section 1 liability is predicated upon some form of concerted action." Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation. *Rossi*, 156 F.3d at 465. This is because a business may "deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

*InterVest, Inc. v. Bloomberg, L.P.,* 340 F.3d 144, 159 (3d Cir. 2003) (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999 (3d Cir. 1994)); *see also In re Baby Food Antitrust Litig.,* 166 F.3d at 117 ("The existence of an agreement is the hallmark of a Section 1 claim.") (citation omitted). "To allege such an agreement between two or more persons or entities, a plaintiff must allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Dentsply Int'l,* 602 F.3d at 254 (quoting *Copperweld Corp.*, 467 U.S. at 771) (other citation omitted).

The court of appeals further explained that a plaintiff may prove the existence of concerted action among the defendants and other parties by relying on either direct or circumstantial evidence. *InterVest,* 340 F.3d at 159. "Direct evidence 'is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Id.* (quoting *In re Baby Food Antitrust Litig.,* 166 F.3d at 118). However, because direct evidence is often not available,

plaintiffs may rely solely on circumstantial evidence, and any reasonable inferences that may be drawn from such evidence, to prove a conspiracy. *Id.* (citing *Rossi,* 156 F.3d at 465).

One type of circumstantial evidence from which the fact finder may infer agreement is parallel conduct or "conscious parallelism." In *Twombly,* the Supreme Court determined the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct in order to survive a motion to dismiss:

> While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." [*Theatre Enterprises*, 346 U.S.] at 540-541, 74 S.Ct. 257. Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is " not in itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed.2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L.Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy").

550 U.S. at 553-54. The Supreme Court went on to explain:

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.
>
> . . .

A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (C.A.1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation-for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint").

*Id.* at 554, 556-57 (footnote omitted).

In applying these precepts to the facts before it, the *Twombly* court concluded that the facts adduced did not support an antitrust conspiracy, and therefore, the complaint failed to state a valid §1 claim. *Id.* at 569. In *Twombly,* plaintiffs, who represented a putative class of subscribers to local telephone and/or high speed internet service, alleged that the incumbent local exchange carriers (ILECs) or "Baby Bells"[10] unlawfully agreed to prevent market entry by upstart regional telephone companies, referred to as competitive local exchange carriers (CLECs), and to refrain from competing with each other. *Id.* at 550-51. In examining the factual allegations in the complaint in support of these two theories, the Supreme Court found that the complaint left no doubt that plaintiffs' §1 claim was predicated on allegations of parallel conduct, and not on any independent allegation of actual agreement among the defendants.[11] *Id.*

---

[10] "Baby Bells" refers to the regional telephone monopolies created in the wake of the 1984 divestiture of the American Telephone & Telegraph Company. *Id.* at 548.

[11] The Court disregarded the few stray statements that spoke directly of an agreement, finding that they constituted legal conclusions. *Id.* at 564.

at 564. Turning to the allegations of parallel conduct, the Supreme Court observed that "the complaint first takes account of the alleged 'absence of any meaningful competition between [the ILECs] in one another's markets,' 'the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs,' 'and the other facts and market circumstances alleged [earlier]'; 'in light of' these, the complaint concludes 'that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another.'" *Id.* at 564-65 (quoting complaint, ¶51). The Supreme Court concluded that these allegations failed to allege a plausible suggestion of conspiracy as "nothing in the complaint intimate[d] that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance." *Id.* at 566. Moreover, the Supreme Court noted an obvious alternative explanation existed for the ILECs' parallel conduct—"the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 567-68. Thus, because the complaint "failed *in toto* to render plaintiffs' entitlement to relief plausible[,]" the Supreme Court upheld dismissal of the complaint. *Id.* at 569 & n. 14.

Turning to the case at bar, Plaintiff argues that she has adequately pled a §1 claim either through: (1) allegations of a specific agreement among Defendants, or (2) allegations of parallel conduct. The Court addresses each of these arguments in turn.

### 1.     Allegations of a Specific Agreement

Initially, Plaintiff submits that she has properly pled a specific agreement in her Complaint. In support, she argues that all she is required to plead, under Third Circuit precedent, is "some form of concerted action," or a "unity of purpose or a common design and understanding or a meeting of minds" or "a conscious commitment to a common scheme." Pl.'s

Mem. in Opp'n to JP Morgan/BOA Mot. to Dismiss ("Pl.'s Mem. in Opp'n") at 18,[12] ECF No. 63 (quoting *In re Baby Food Antitrust Litig.,* 166 F.3d at 117; *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 357 (3d Cir. 2004) (citation omitted)). Pointing to the allegations in paragraph 36 of the Complaint, Plaintiff submits she has properly alleged an agreement "because all lenders have adopted the same consistent pricing system." She further argues that by adopting a consistent and uniform system, lenders consequently operate with a unity of purpose and common design which necessarily meets the judicial standard of an "agreement." *Id.* at 18-19. With regard to Defendants' argument that the "Complaint cites no factual allegations to support an inference that defendants have agreed on how to perform [the] evaluation or determine [the] interest rate", Plaintiff submits Defendants' argument is wrong because the complaint clearly alleges that the terms of the price agreement are found in the credit score, which has been adopted as a uniform interpretation of how to price loans. *Id.* at 19 (citing Compl., ¶36).

The Court does not find any merit to Plaintiff's argument. First, Plaintiff has misstated the pleading standard for a §1 conspiracy. Contrary to Plaintiff's argument, the court of appeals in *Flat Glass* did not hold that all a plaintiff is required to plead to survive a motion to dismiss a §1 claim is "some form of concerted action" or a "'unity of purpose or a common design and understanding or meeting of minds.'" Rather, the court of appeals was reiterating the Supreme Court's interpretation of the terms "contract," "combination," or "conspiracy," and did not even address the required showing to establish such concerted action or meeting of minds at the motion to dismiss stage, because *Flat Glass* involved an appeal regarding the adequacy of

---

[12] The page references to Plaintiff's memoranda in opposition to the Defendants' motions to dismiss are to the ECF page number on the top of the documents, as Plaintiff has failed to number the individual pages of her briefs.

plaintiffs' showing at the summary judgment stage. Black's reliance on *Baby Food* fails for the same reason.

Second, Plaintiff fails to point to any *factual* allegations in the Complaint that show or suggest a specific agreement. In support of her position that she has properly pled a specific agreement, Plaintiff relies primarily on the allegations set forth in paragraph 36 of the Complaint:

> Furthering the conspiracy, credit scoring companies use the reported information from credit bureaus to create a derivative score which incorporates all of the consumer's credit data as well as the consumer's profitability. This score is then distributed to all lenders. The lending industry has identified that the most profitable customers are the ones having the lower credit scores. Consequently, by examining credit scores lenders can rapidly identify the most profitable customers and fix rates accordingly. Thus, credit scoring companies assist lenders in effecting a parallel pricing scheme for credit by creating a derivative metric which is an effective proxy for setting uniform price points among competitors.

Clearly, however, paragraph 36 does not contain any factual allegations suggesting a specific agreement to fix prices. In actuality, in paragraph 36, Plaintiff pleads, in general and conclusive terms, parallel conduct allegedly engaged in by the lending industry.[13]

Moreover, a review of the remaining allegations in the Complaint yields a similar conclusion. For example, in paragraph 43, Plaintiff alleges that "Defendants have also schemed to restrain trade by creating pricing floors." In paragraph 44, Plaintiff alleges "Defendants have additionally colluded to charge monopolistic punitive fees . . .." In paragraph 52, Plaintiff

---

[13] With regard to Plaintiff's allegations of parallel conduct, even if the Court assumes, for purposes of the motion to dismiss, that all lenders have adopted the same consistent pricing system, that fact alone does not nudge the Complaint across the line from possibility to plausibility of entitlement to relief. As explained below, Plaintiff must allege some further circumstance pointing toward a meeting of the minds to fix the price of loans in order to cross that line. *Twombly,* 550 U.S. at 556-57.

asserts "The lenders have acted collectively to increase the interest rates and fees . . .." In paragraph 67, Plaintiff alleges:

> Beginning at least in 1951, the exact date being unknown, Defendants and their co-conspirators have engaged in a continuing combination, conspiracy and common course of conduct in unreasonable restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. §1. As more fully described herein, the combination, conspiracy and common course of conduct including sharing of proprietary consumer information engaged in by the Defendants consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to restrain the availability of consumer loans and then fix and maintain at artificially high and non-competitive levels the prices at which they made loans, as well as nationally boycott consumers unable to unwilling to pay monopolistic prices.

In paragraph 68, Plaintiff alleges "Pursuant to their combination, conspiracy, and concerted actions, Defendants have adopted and adhered to virtually identical and parallel methods of pricing . . .." In paragraph 70, Plaintiff alleges "each Defendant took actions to restrain the availability of consumer credit and fix the prices for consumer lending. Pursuant to the combination, conspiracy, and concerted action, Defendants have consistently adopted and adhered to coordinated parallel-pricing schemes and boycotts." In paragraph 72, Plaintiff asserts ". . . the letter sent to Plaintiff [by JP Morgan] indicat[es] that the change in position on her credit line was not due to independent market factors, but rather cooperation, understanding, and agreement among competitors." And, in paragraph 75, Plaintiff alleges "The agreement among competitors in the lenders' market to share pricing data in the form of credit reports . . .." Like the complaint in *Twombly,* here the above statements in Black's Complaint that refer to an "agreement" or some sort of concerted action constitute conclusory allegations or legal conclusions. These allegations must be disregarded in evaluating the sufficiency of the

Complaint under Rule 12(b)(6). When the Court examines the remaining factual allegation in the Complaint, it finds nothing suggesting an actual agreement between Defendants to fix the price of loans or to boycott certain consumers.

Next, Plaintiff argues that to the extent Defendants submit that an actual meeting and formal agreement must be alleged, Defendants misconstrue the case law. Plaintiff submits that a conspiracy can be found where there is "'a conscious commitment to a common scheme,'" citing *Flat Glass,* 385 F.3d at 357 (quoting *Monsanto,* 465 U.S. at 764). According to Plaintiff, competitors rarely structure an agreement which is collusive on its face, but rather, use sophisticated systems to hide the nature of the understanding among them. Thus, Plaintiff maintains that the Complaint should not be dismissed simply because Defendants have successfully hidden the pricing terms. This argument likewise lacks merit. First, Defendants are not arguing that an actual meeting and formal agreement are required. Second, as noted above, even under the proper standard, Plaintiff's factual allegations fall short of the mark.[14]

Plaintiff's final argument on this point responds to the position advanced by Defendant Lenders—that other than alleging that they conspired to restrict the availability of consumer credit and to fix the price of that credit, "[b]eginning at least in 1951, the exact date being unknown," (Compl. ¶67), Black fails to plead any facts to suggest a specific time, place, or the person(s) involved in the alleged conspiracy, or to provide them with some idea as to which of

---

[14] Plaintiff also advances the argument that to the extent Defendants are contending that the Complaint is insufficient for not using the magic language of "agreement," but instead pleads "conspiracy," Defendants ignore the plain meaning of the word conspiracy and, in any event, there is no requirement in the case law that the term "agreement" be used to properly plead an antitrust violation. The Court does not construe Defendants' argument to be making any such distinction. Indeed, Defendants clear up any confusion on this point in their Reply Memorandum. (Reply Mem. of Law in Supp. of Mot. to Dismiss ("Lenders' Reply Mem.") at 2 n. 2, ECF No. 66.)

them (much less which of their employees) supposedly agreed, or when or where the illicit agreement occurred. Defendants contend the "sole factual allegations contained in the complaint assert that, for some period of time, [D]efendants have shared consumer credit history information for purposes of evaluating consumer creditworthiness and pricing consumer credit." Mem. of Law in Supp. of Mot. of Defs. JP Morgan & BOA to Dismiss ("Lenders' Mem.") at 10, ECF No. 34. In support, Defendants rely on dictum from *Twombly*, in which the Supreme Court noted that had the complaint not explained that the claim of agreement rested on allegations of parallel conduct, the mere reference to an agreement among the defendants would have been insufficient to provide the notice required by Federal Rule of Civil Procedure 8, as alleging merely that the Section 1 violations occurred over a seven-year period, without alleging any "specific time, place or person involved in the alleged conspiracies . . . furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." 550 U.S. at 565 n. 10.

In response to this argument, Plaintiff disagrees with Defendants that she is required to state the specific time, place and persons involved in the conspiracy. Plaintiff argues that because her claim of conspiracy, like *Twombly,* rests on parallel conduct described in the Complaint, she is not required to mention a specific time, place or person involved in each conspiracy allegation. Pl.'s Mem. in Opp'n at 21, ECF No. 63. In support, Plaintiff cites *Starr v. Sony BMG Music Entertainment,* 592 F.3d 314, 325 (2d Cir. 2010), *cert. denied*, 131 S.Ct. 901 (2011) (citing *Twombly*, 550 U.S. at 565 n. 10), in which the court of appeals ruled that *Twombly* did not require plaintiffs to state a specific time, place or person involved in each conspiracy allegation. Thus, Plaintiff maintains that notice pleading is the proper standard under *Twombly,* and under that standard, she has "properly alleged in the complaint how the agreement and

understanding operates—adoption of a uniform pricing model in the form of a derivative credit score. (Compl. ¶36)." Pl.'s Mem. in Opp'n at 21, ECF No. 63. Because Defendants are on notice as to what actions constitute the basis for her Complaint, Black contends that factual details as to time, place and persons involved are the proper subjects of discovery.

While Plaintiff is correct that the court of appeals in *Starr* rejected defendants' argument that *Twombly* requires an antitrust plaintiff to identify the specific time, place and persons related to each conspiracy allegation, the *Starr* court explained that it was doing so because, as in *Twombly*, the conspiracy claim rested on allegations of parallel conduct. *Starr,* 592 F.3d at 325. However, in the case at bar, Plaintiff has advanced alternative theories of proof of an antitrust conspiracy. In addition to allegations of parallel conduct, Plaintiff contends she has pled a specific agreement through direct evidence in the JP Morgan letters.

Plaintiff contends that two letters dated May 5, 2009 addressed to her and sent by JP Morgan[15] (the "JP Morgan letters") provide "direct evidence of a conspiracy, which operates independently of an alleged 'bare allegation of parallel conduct' that *Twombly* addressed." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 7, ECF No. 63. Specifically, Plaintiff argues that the JP Morgan letters show that "competing lenders are taking coordinated action against their customers based on sharing information about those individuals among themselves." *Id.* Plaintiff further submits that unlike independent market parallelism, these letters show that action was taken based on communication between the competitors and not independent action, which clearly infers the existence of an agreement or understanding among competitors. *Id.* In addition, Plaintiff takes issue with Defendants' failure to mention these letters, stating that their

---

[15] The letters from JP Morgan are attached to Plaintiff's Complaint as Exhibit A.

"silence on the issue is deafening." *Id.* According to Plaintiff, because Defendants' have failed to contest this point, the letters provide evidence of a conspiracy, and the case should be allowed to proceed as proper notice has been given as to the nature, scope, and factual basis for the allegations.

In response, Defendants submit that the two letters from JP Morgan do not contain any direct evidence showing any such agreement. *See* Lenders' Reply Mem. at 3, ECF No. 66. According to Defendants, the letters indicate that JP Morgan is reducing Plaintiff's credit limit but make no mention at all of Plaintiff's credit score. On this latter point, Defendants argue, the letters are entirely inconsistent with Plaintiff's theory that lenders rely solely on credit scores and do not independently evaluate other "neutral" credit history information. *Id.* In addition, Defendants submit that the letters do not contain any facts or information showing that JP Morgan made the decision to reduce Plaintiff's credit limits as part of an agreement with competing lenders, or remotely suggesting that JP Morgan's credit decisions were not the result of its unilateral exercise of its independent judgment about Plaintiff's creditworthiness and the credit terms it was prepared to offer Plaintiff. *Id.* Finally, Defendants maintain that Plaintiff has not alleged any facts that would constitute direct evidence of an unlawful agreement. *Id.*

The Court agrees with Defendants that the letters from JP Morgan do not constitute direct evidence of an agreement or conspiracy. In the letters, JP Morgan stated that its reasons for the decision to decrease Plaintiff's credit limit/line were: "Balance owed on revolving accts too high" and "[c]urrent loan amount on all open accounts." Ex. A to Compl., ECF No. 1-2. With regard to the decrease in her credit line, JP Morgan provided the additional explanation "[s]ufficient credit available with us." *Id.* The letters go on to explain: "This decision was based in whole or in part on information provided by [Equifax]. Other than providing

23

information, [Equifax] played no part in our decision. . . ." *Id.* Contrary to Plaintiff's argument, the Court finds that the content of the letters does not show, or even suggest, that JP Morgan made the decision to reduce Plaintiff's credit limits as part of an *agreement* with competing lenders. Rather, the letters expressly state that JP Morgan made its decision to reduce Plaintiff's credit limit based on information supplied by Equifax. At best, this suggests a one-way communication, which falls short of the required "meeting of the minds" to infer an agreement. In addition, the letters clearly state that Equifax played no part in JP Morgan's decision to reduce Plaintiff's credit limit. Again, it is unreasonable to infer "agreement" from this statement. Moreover, the letters clearly state independent bases for JP Morgan's decision to decrease Plaintiff's credit limit—too high balance owed on revolving accounts, the current loan amount on all open accounts, and sufficient credit available with JP Morgan. Thus, nothing contained in either letter provides direct evidence of a preceding agreement between competing lenders or between JP Morgan and Equifax to fix loan prices.[16]

Moreover, other than wholly conclusory allegations of an agreement among Defendants, which provide no indication (or inference) as to which of the Defendants or their employees supposedly agreed to fix loan prices, or when and where said agreement took place, the Complaint is devoid of factual allegations of an actual agreement, and therefore, is insufficient to provide the notice required by Rule 8. Nonetheless, because Black is not relying exclusively on independent allegations of an actual agreement to prove her claim, her failure to plead sufficient facts of an actual agreement is not fatal to her §1 claim.

---

[16] Plaintiff's argument misses the mark for another reason. Direct evidence is evidence which requires no inferences to establish the asserted proposition, but is explicit on its face. *InterVest,* 340 F.3d at 159 (citation omitted). By asking the Court to *infer* an agreement from the text of the letters, Plaintiff appears to be conceding that the letters do not constitute direct evidence of an agreement.

## 2. Allegations of Parallel Conduct

Where, as here, an antitrust plaintiff intends to prove her §1 claim based on circumstantial evidence of parallel conduct, she must also plead plus factors. *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 323-24 (3d Cir. 2010). Because the courts have found parallel conduct is just as likely to be in line with a wide array of rational and competitive business judgments unilaterally prompted by common market perceptions, the courts have required an antitrust plaintiff to plead facts suggesting that defendants were not acting independently. *Id.* at 321. Thus, "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor,' since plus factors are, by definition, facts that 'tend[ ] to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors.'" *Id.* at 323 (quoting *Flat Glass,* 385 F.3d at 360) (other citations omitted). Although not a finite list, the court of appeals has delineated three plus factors that may nudge the allegations of parallel conduct across the line from a conceivable to a plausible §1 claim: "'(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.''" *Id.* at 322 (quoting *Flat Glass,* 385 F.3d at 360 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1244 (3d Cir.1993))). In evaluating the first two factors, the court of appeals has cautioned that the evidence must go beyond indicating that market behavior is interdependent and characterized by conscious parallelism. *Id.* (citations omitted). With regard to the third plus factor, the court of appeals explained that "'evidence implying a traditional conspiracy,' consists of 'non-economic evidence 'that there was an actual, manifest agreement not to compete,'' which may include ''proof that the defendants got together and exchanged assurances of common action or

otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'"" *Id.* (quoting *Flat Glass*, 385 F.3d at 361 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir.2002))) (other citations omitted).

In the case at bar, Plaintiff submits that the "conspirators are acting in parallel based on their communications with each other regarding their customers[.]" Pl.'s Mem. in Opp'n at 8, ECF No. 63. To nudge her §1 claim across the line from conceivable to plausible, Plaintiff proffers evidence which she contends provides the requisite plus factors. This evidence includes the two letters from JP Morgan, information posted on the website of VantageScore, and a statement allegedly contained in FICO's trademark registration document. Plaintiff contends these documents provide circumstantial evidence from which an agreement can be inferred.

Turning first to the two JP Morgan letters, Plaintiff submits that this evidence shows that "Defendants changed position based on communication with a competitor." Pl.'s Mem. in Opp'n at 8, ECF No. 63. Plaintiff further submits that this "negative event impacted [her] credit score[,]" and, as alleged in paragraph 36 of her Complaint, "the 'Credit Score' provides the instructions for the uniform system for pricing loans." *Id.* According to Plaintiff, this shows that she is a victim of the price fixing conspiracy. *Id.*

For the reasons stated above, the Court finds that the JP Morgan letters do not show that that JP Morgan (or any other named Defendant for that matter) changed positions based on communications with an unidentified competitor. Rather, the letters show that JP Morgan decided to reduce Plaintiff's credit limit based on several factors, one of which was information provided by Defendant Equifax. The Court cannot glean from that statement, or any other statement in the JP Morgan letters, any suggestion of a preceding agreement between competing lenders, or between JP Morgan and Equifax, to fix the terms of Plaintiff's credit. Moreover,

Plaintiff's argument is undermined by the fact that the only communication suggested in the JP Morgan letters is between non-competitors. With regard to Plaintiff's argument in her brief that the reduction in her credit limit impacted her credit score, there is simply no factual support for this statement in the Complaint. The Court concludes, therefore, that the JP Morgan letters do not provide circumstantial evidence of an agreement.

Plaintiff also argues that her case is factually distinguishable from *Twombly* because in that case, the plaintiff only alleged parallel conduct with nothing more. By contrast here, Black submits it is unarguable that the parallel conduct is due to communications among competitors, with a plausible inference that such communication is based on an understanding among competitors. In fact, Plaintiff contends that such communication and understanding is more than plausible—it is literally true as entered into the evidentiary record and ignored in the Defendants' brief. *Id.* at 9. Thus, this case should not be dismissed, Plaintiff maintains, because the nature and scope of the communications and the understanding among competitors regarding such communications are obviously the cause of the parallel conduct. *Id.*

The Court finds that like *Twombly*, Plaintiff's factual allegations fall short of showing a preceding agreement. Under *Twombly*, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement[.]" 550 U.S. at 557.[17] In the case at

---

[17] The Supreme Court in *Twombly* noted that several commentators provided examples of parallel conduct allegations that would be sufficient to state a §1 claim under its newly enunciated plausibility standard, which included "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," or "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement". 550 U.S. at 556 n. 4 (citations omitted). In addition, the parties in *Twombly,* "agree[d] that 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy." *Id.* In the case at bar, the allegations of parallelism do not describe conduct that falls within any of these examples. Indeed, as noted below, the parallelism asserted here at best resulted from mere interdependence unaided by an advance

bar, the relevant context is the consumer lending industry, and in particular, the sharing of customers' credit history information to set credit terms and limits on consumer credit cards. In determining whether Plaintiff has alleged facts suggesting a preceding agreement among the eight named Defendants to fix credit terms of consumer credit cards, the Court examines the Complaint, and any documents incorporated by reference, for factual assertions referencing or suggesting some cooperation, understanding or agreement between Defendants regarding fixing credit terms, such as discussions, meetings, or other communication between the Defendants.[18] When the Court does so, the only reference to or suggestion of communication between any of the Defendants is contained in paragraph 72 of the Complaint, which references the JP Morgan letters.[19] As previously discussed, however, a close examination of these letters does not reveal any direct or circumstantial evidence that JP Morgan changed Plaintiff's credit terms based on cooperation, understanding or an agreement among competitors, or between JP Morgan and Equifax. Because the JP Morgan letters do not constitute a "tacit invitation . . . to join a coordinated credit policy" directed towards Plaintiff, *Michelman,* 534 F.2d at 1048-49,[20] no foundation exists for a plausible §1 claim.

Likewise, Plaintiff's conclusory assertion that JP Morgan used competitively sensitive information obtained from unidentified competitors to set prices, foreclose credit lines, and/or

---

understanding among the parties.

[18] The Court's focus on communications between Defendants is appropriate given Plaintiff's argument in her brief to the effect that the parallel conduct of Defendants is based on their communications with each other regarding their customers. Pl.'s Mem. in Opp'n at 8, ECF No. 63.

[19] In paragraph 72 of her Complaint, Plaintiff is asserting essentially that the letters she received from JP Morgan indicate JP Morgan changed its position on her credit line due to cooperation, understanding, and agreement among competitors, rather than independent market factors, and thus prove that JP Morgan used competitively sensitive information obtained from other yet to be identified lenders to set prices, foreclose credit lines, and accelerate default. Compl., ¶ 72.

[20] The court of appeals decision in *Michelman* is discussed in more detail in Part 3, *infra,* at 37-38.

accelerate default, in and of itself, does not suggest a plausible §1 claim.  The sharing of consumers' credit history information does not constitute a violation of the Sherman Act without some factual allegations suggesting that the lenders have come to some understanding or agreement among themselves on the credit eligibility of consumers with a particular credit score, or the credit limits or interest rates to be offered to such consumers.  Here the Complaint is completely devoid of any factual allegations showing or suggesting that JP Morgan, BOA, Discover, and/or any unnamed competitors came to an understanding or agreement to fix eligibility criteria, credit limits, or interest rates to be applied to Plaintiff or any of the putative class members.  In addition, there is a legitimate, independent basis for the sharing of consumer credit history information.  Historically, lenders have used credit history information provided by credit bureaus and credit scoring companies to assess risk levels for setting credit terms and interest rates.  The practice of sharing consumer credit history information has been lawful under the antitrust laws since at least 1925.  *Cement Mfrs.' Protective Ass'n v. United States,* 268 U.S. 588 (1925).  Thus, without the necessary suggestion of a preceding agreement to fix credit terms/rates, the Court cannot say that JP Morgan's decision to reduce Plaintiff's credit limit was due to anything other than independent market factors.

Additional plus factors proffered by Plaintiff consist of certain statements appearing on the websites maintained by the Credit Scoring Company Defendants, VantageScore and FICO.  Specifically, Plaintiff submits that a conspiracy can be inferred from the following statement appearing on VantageScore's website:  "Banks, credit card companies, and other lenders use credit scores to assess a borrower's loan eligibility and set loan/credit terms."  Ex. B to Pl.'s Mem. in Opp'n, ECF No. 63-2.  In addition, Plaintiff directs the Court to FICO's trademark registration, which allegedly contains the statement "lenders use their scoring model to set

prices." Pl.'s Mem. in Opp'n 10, ECF No. 63. However, no such document is attached to her memorandum in opposition (ECF No. 63), nor was it attached to any of Plaintiff's other papers and/or memorandums filed in opposition to the motions to dismiss of the other Defendants. Rather, Plaintiff has attached an excerpt from FICO's website relating to FICO® Score Delivery. *See* Ex. C to Pl.'s Mem. in Opp'n, ECF No. 63-3.[21] Plaintiff posits that these statements by the Credit Scoring Company Defendants constitute an admission and recommendation that lenders set their lending terms according to the scoring model, not independent analysis of credit histories and, as such, provide direct evidence of a conspiracy and an overwhelming plus factor required for pleading parallel conduct under *Twombly.* (Pl.'s Mem. in Opp'n at 10, ECF No. 63.)

The Court finds no support for Plaintiff's position in the information reported on the websites of VantageScore and FICO. First, the Complaint does not contain any factual allegations regarding the information on the websites or in FICO's trademark registration. Rather, the only place this information appears is in Plaintiff's brief. However, even if these allegations were contained in the Complaint, they fall short of raising the suggestion of a preceding agreement between Defendants to fix the price of loans/credit. The statements appearing on the websites are not directed to any particular persons or entities, and thus, cannot be used to show concerted action or a "meeting of the minds" between Defendants. In addition, there is no indication of when these statements first appeared, and therefore, Plaintiff has not established that they preceded the decision to reduce her credit limit. At best, the information

---

[21] The excerpt from FICO's website attached as Exhibit C to ECF No. 63 states that the FICO scores give lenders "insight into [their] own customers' risk and revenue potential, and . . . updated scores . . . [can be] us[ed] to make more profitable decisions for credit line management, cross-selling, balance building, pricing, customer retention, activation, collections resource allocation and point-of-sale authorizations." *See* ECF No. 63-3.

provided on the websites constitutes a one-way communication from the Credit Scoring Company Defendants to potential clients—banks, credit card companies, and other lenders—recommending certain uses of their credit scores. The Credit Scoring Companies' websites do not instruct potential clients to use their credit scores exclusively to set loan prices. Absent such instruction, it is irrational to infer from the websites that the credit scoring companies have admitted and recommended that lenders refrain from engaging in independent analysis of credit histories in setting their lending terms. It is simply irrational to suggest that the referenced website statements provide direct or circumstantial evidence that the banks, credit card companies, and other lenders entered into an agreement to use the credit scores to fix credit at a certain price.

Finally, Plaintiff contends that further factual evidence exists in the Complaint, which Defendants have ignored. In particular, Plaintiff submits that in paragraphs 41 through 43, the "Complaint properly alleges that anticompetitive pricing terms are present in the scoring model adopted by the lenders, in the form of punishment and pricing floors." Pl.'s Mem. in Opp'n at 9, ECF No. 63. When the Court discards the conclusory allegations in paragraphs 41 through 43 of the Complaint, the factual allegations contained in those paragraphs assert that all consumer lenders provide loans at a variable interest rate tied to the prime lending rate, which is a pricing floor that no lender will ever go below. (Compl., ¶43.) The price floor baseline is elevated for customers based on the shared credit information. *Id.* However, these factual allegations simply do not support Plaintiff's argument that the Complaint properly alleges that anticompetitive pricing terms are present in the scoring model adopted by the lenders. Indeed, the practice of tying the interest rate to the prime lending rate is not unlawful and has been followed historically in the consumer lending industry. Moreover, elevating the pricing floor or baseline to take into

account a particular customer's credit information/risk is also entirely appropriate.

In further support of her argument, Plaintiff cites *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 648 (1980), for the proposition that "credit terms must be characterized as an inseparable part of the price." Pl.'s Mem. in Opp'n at 9, ECF No. 63. However, Plaintiff fails to explain how *Catalano* is relevant to her case. *Catalano* involved a secret agreement among wholesalers to terminate the practice of extending short-term interest free credit on beer purchases to plaintiffs, a conditionally certified class of beer retailers. The Supreme Court held that the agreement to fix credit terms was tantamount to an agreement to eliminate discounts which was done to fix the price of beer sales, and thus, was unlawful *per se. Id.* at 648. In other words, because credit terms are increasingly viewed as an element of price, interference with credit terms necessarily involves interference with price, which is regarded as illegal *per se* under the Sherman Act. *Id.* at 648 n. 11 (citations omitted). It is important to note that the Supreme Court in *Catalano* was not faced with the question of whether an agreement existed in the first instance—that fact had already been determined. Rather, the Supreme Court was faced with the question of whether an agreement to fix credit terms was tantamount to price fixing which is unlawful *per se* under the Sherman Act. While the Supreme Court's decision in *Catalano* certainly supports the principle that an agreement can be unlawful *per se* where the terms agreed to are something other than price itself, such as credit terms, here, unlike *Catalano,* Plaintiff has failed to come forward with facts to show or infer an agreement in the first instance.

Plaintiff further argues that:

> One form of coordinated action dictated by a credit score is the lowering of the credit score where a person pays off a credit card. (Compl. ¶40-41). In other words, all the lenders use the uniformly lowered credit score to act in parallel to increase the price even though such actions by the consumer actually increase

creditworthiness and decrease risk to all of the lenders. Further, as the complaint properly alleges, the credit scores are manipulated for loan re-pricing, even though the customer has been previously been deemed creditworthy and the lender is no longer subject to risk, having underwritten the underlying debt in the form of insurance and credit swap derivatives, which results in monopolistic and uniform pricing. (Compl. ¶ 36, 38).

Pl.'s Mem. in Opp'n at 9-10, ECF No. 63. Plaintiff submits that "these factual allegations alone are sufficiently specific and plausible to plead a claim on which relief may be granted." *Id.* at 10. The Court disagrees. First, many of the statements in paragraphs 36, 38, 40 through 43 are conclusory as opposed to factual in nature, and thus, must be disregarded for purposes of the motion to dismiss. Second, when the factual allegations in these paragraphs are isolated,[22] the Court finds that none of them provide evidence of any plus factors, as they do not evince a motive to enter into a price fixing conspiracy or show Defendants were acting against their own self-interests. The factual allegations in those paragraphs do not go beyond suggesting interdependent market behavior and conscious parallelism which, under *Twombly*, is insufficient to state a §1 claim.

### 3. Sharing Customers' Credit Information

Next Defendants submit the "sole factual allegations contained in the complaint assert that, for some period of time, [D]efendants have shared consumer credit history information for purposes of evaluating consumer creditworthiness and pricing consumer credit." Lenders' Mem. at 10, ECF No. 34. However, sharing customer credit history information, even if it were conducted pursuant to an agreement to exchange such information, according to Defendants, is

---

[22] The factual allegations in those paragraphs can be distilled essentially as follows: Credit scores are lowered when a consumer pays off a credit card. Lenders use the lowered credit score to increase the interest rate (and thus the price), even though such payoffs actually increase a consumers' creditworthiness and decrease risk to all of the lenders.

entirely lawful under the antitrust laws. *Id.* Indeed, Defendants maintain that this practice has been lawful under the antitrust laws since at least 1925, and cite in support *Cement Manufacturers, supra*. Moreover, Defendants submit the use of consumer credit scoring is wide spread and encouraged by federal bank regulators as a means to expand access to credit, promote competition and improve market efficiency. Lenders' Reply Mem. at 5, ECF No. 66 (citing Bd. of Governors of the Fed. Res. Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit,* at 1 (Aug. 2007), http://www.federalreserve.gov/boarddocs/RptCongress/creditscore/creditscore.pdf ("Bd. of Governors").

In *Cement Manufacturers*, members of the association dispensed monthly reports of all customer accounts which were past due by two months or more, which included the name and address of the delinquent debtors, the amount overdue, any explanation for the delinquency (such as the debtor claimed an offset or otherwise disputed the debt), and indicated whether the account had been turned over to attorneys for collection. *Id.* at 599. The Supreme Court reversed the decision of the district court in favor of the government and held that the exchange of credit history information among cement manufacturers relating to the creditworthiness of their customers did not violate the antitrust laws. *Id.* at 606. In arriving at this conclusion, the Supreme Court reasoned:

> The government neither charged nor proved that there was any agreement with respect to the use of this information or with respect to the persons to whom or conditions under which credit should be extended. The evidence falls far short of establishing any understanding on the basis of which credit was to be extended to customers, or that any co-operation resulted from the distribution of this information, or that there were any consequences from it other than such as would naturally ensue from the exercise of the individual judgment of manufacturers in determining, on the basis

of available information, whether to extend credit or to require cash or security from any given customer.

*Id.* at 599-600. The Court noted that in *Swift & Co. v. United States,* 196 U.S. 375, 393 (1905), it "approved a decree which provided that defendants should not be restrained 'from establishing and maintaining rules for the giving of credit to dealers where such rules in good faith are calculated solely to protect the defendants against dishonest or irresponsible dealers.'" *Cement Mfrs.,* 268 U.S. at 604. The Court then went on to explain:

> Distribution of information as to credit and responsibility of buyers undoubtedly prevents fraud and cuts down to some degree commercial transactions which would otherwise be induced by fraud. But for reasons stated more at length in our opinion in *United States v. Maple Flooring Association, supra,* we cannot regard the procuring and dissemination of information which tends to prevent the procuring of fraudulent contracts or to prevent the fraudulent securing of deliveries of merchandise on the pretense that the seller is bound to deliver it by his contract, as an unlawful restraint of trade even though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned.

*Id.*

Similarly in *Maple Flooring Manufacturers' Ass'n v. United States,* 268 U.S. 563, 565-67 (1925),[23] the Supreme Court reversed a judgment in favor of the government where the alleged antitrust conspiracy was an agreement to exchange historical cost and sales information among members of an association who were competitors in the business of selling and shipping wood flooring in interstate commerce. The Court pointed out that the government had neither alleged nor proved that any agreement existed among the association's members affecting production, fixing prices, or for price maintenance. *Id.* at 567. Rather, the government had

---

[23] The Supreme Court issued its decision in *Maple Flooring* the same day it decided *Cement Manufacturers.*

alleged only that the exchange of information had resulted in the maintenance of practical uniformity in net delivered prices. *Id.* In rejecting the government's argument, the Supreme Court in *Maple Flooring* explained:

> It is the consensus of opinion of economists and of many of the most important agencies of government that the public interest is served by the gathering and dissemination, in the widest possible manner, of information with respect to the production and distribution, cost and prices in actual sales, of market commodities because the making available of such information tends to stabilize trade and industry, to produce fairer price levels and to avoid the waste which inevitably attends the unintelligent conduct of economic enterprise. 'Free competition' means a free and open market among both buyers and sellers for the sale and distribution of commodities. Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction. General knowledge that there is an accumulation of surplus of any market commodity would undoubtedly tend to diminish production, but the dissemination of that information cannot in itself be said to be restraint upon commerce in any legal sense. The manufacturer is free to produce, but prudence and business foresight based on that knowledge influences free choice in favor of more limited production. Restraint upon free competition begins when improper use is made of that information through any concerted action which operates to restrain the freedom of action of those who buy and sell.

*Id.* at 585 (footnote omitted). The Supreme Court went on to explain:

> It was not the purpose or the intent of the Sherman Anti-Trust Law to inhibit the intelligent conduct of business operations, nor do we conceive that its purpose was to suppress such influences as might affect the operations of interstate commerce through the application to them of the individual intelligence of those engaged in commerce, enlightened by accurate information as to the essential elements of the economics of a trade or business, however gathered or disseminated. Persons who unite in gathering and disseminating information in trade journals and statistical reports on industry, who gather and publish statistics as to the amount of production of commodities in interstate commerce, and

who report market prices, are not engaged in unlawful conspiracies in restraint of trade merely because the ultimate result of their efforts may be to stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them, for the simple reason that the Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information. Sellers of any commodity who guide the daily conduct of their business on the basis of market reports would hardly be deemed to be conspirators engaged in restraint of interstate commerce. They would not be any the more so merely because they became stockholders in a corporation or joint owners of a trade journal, engaged in the business of compiling and publishing such reports.

*Id.* at 583-84. The Court in *Maple Flooring* thus held:

We decide only that trade associations or combinations of persons or corporations which openly and fairly gather and disseminate information as to the cost of their product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate cost of transportation from the principal point of shipment to the points of consumption as did these defendants and who, as they did, meet and discuss such information and statistics without however reaching or attempting to reach any agreement or any concerted action with respect to prices or production or restraining competition, do not thereby engage in unlawful restraint of commerce.

*Id.* at 586.

The Court's analysis in *Maple Flooring* has been applied by numerous federal courts since its publication eighty-six years ago. In *Michelman v. Clark-Schwebel Fiber Glass Corp.,* the court of appeals relied on *Cement Manufacturers* in holding:

The exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act. *See Cement Manufacturers Protective Association v. United States*, 268 U.S. 588, 604, 45 S.Ct. 586, 591, 69 L.Ed. 1104, 1111 (1925). Unlike exchanges regarding prices, which usually serve no purpose other than to suppress competition and hence fall within the ban of the Sherman Act, *see United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510,

> 21 L.Ed.2d 526 (1969), the dissemination to competitors of
> information concerning the credit-worthiness of customers aids
> sellers in gaining information necessary to protect themselves
> against fraudulent or insolvent customers. *See id*. at 335, 89 S.Ct.
> at 511, 21 L.Ed.2d at 528. *Cement Manufacturers Protective Assn.*
> *v. United States, supra*, 268 U.S. at 604, 45 S.Ct. at 591, 69 L.Ed.
> at 1111. Given the legitimate function of such data, it is not a
> violation of § 1 to exchange such information, provided that any
> action taken in reliance upon it is the result of each firm's
> independent judgment, and not of agreement.

534 F.2d at 1048. Several other courts have held likewise. *See e.g., Zoslaw v. MCA Distrib.*

*Corp.,* 693 F.2d 870, 885-86 (9th Cir. 1982) (rejecting argument that all exchanges of credit

information are *per se* violations of §1 of the Sherman Act, and holding that the exchange of

information regarding individual retailers' credit histories and total indebtedness, for the

individual use by members of a credit managers' association in determining whether to offer

credit, did not constitute a violation of §1 where there was no indication of an agreement to fix

credit terms); *Burtch v. Milberg Factors, Inc.,* Civ. No. 07-556, 2009 WL 840589, at *10 (D.Del.

Mar. 30, 2009) (the alleged sharing of customer credit information among competitors was not

the type of information-sharing that has been held to violate federal antitrust laws); *Kasada,*

2004 WL 2903776, at *6 (quoting *Michelman,* 534 F.2d at 1048) (rejecting garment

manufacturers' price fixing and group boycott claims against various credit institutions,

predicated on the exchange of credit information, noting that the "'exchange of information

between business firms concerning the credit-worthiness of customers has long been held not to

violate the Sherman Act.'"); *Metro Video Dist., Inc. v. Vestron Video, Inc.,* CIV No. 89-0640

PG, 1990 WL 58463, at *10 (D. P.R. Feb. 8, 1990) (where no agreements regarding price fixing

were ever reached, video software manufacturers credit association's exchange of dealers'

historical credit information, which contained no price information, did not violate federal antitrust laws).

In opposing the motion to dismiss, Plaintiff attempts to distinguish *Cement Manufacturers* from the case at bar.  Plaintiff argues that the Supreme Court did not subsequently ratify price fixing arrangements that are tied to such data exchanges.  Plaintiff submits that a dispositive fact not present in *Cement Manufacturers* (or any of the other cases cited by Defendants) is that the defendants did not also adopt a uniform credit score/pricing system based on the customer information exchanged, as in the instant matter.  (Pl.'s Mem. in Opp'n at 16-17, ECF No. 63.)  Plaintiff's argument equates the credit score to a pricing model,[24] and posits that by using and promoting a uniform credit score, in addition to raw data, lenders, credit scoring companies, and credit bureaus ignored the guidance of the Supreme Court in *Cement Manufacturers*.  Consequently, Plaintiff contends the uniformly adopted industry credit score determines and/or provides a guideline for setting the price of loans, and therefore precludes the exercise of individual judgment of the competitors as required by the Supreme Court in *Cement Manufacturers*.  Thus, by linking a pricing model (credit score) to the credit reporting system, Plaintiff concludes that Defendants have coordinated and stabilized pricing, which is clearly outside the scope of the lawful purposes of sharing the credit data.[25]

---

[24] Plaintiff submits that the "term 'credit score' is simply a euphemism for pricing point", Pl.'s Mem. in Opp'n at 12, ECF No. 63, but fails to cite any authority for this proposition, most likely because none exists.

[25] Plaintiff also attempts to distinguish the Supreme Court's decision in *Maple Flooring* on the basis that the data exchanged in that case was aggregate statistical data, which did not identify individual customers, much less a pricing score.  However, Plaintiff's attempt falls short as no pricing information was exchanged here and the identities of the customers was not dispositive.  Plaintiff also cites *Container Corp.* in support of her argument that *Cement Manufacturers* and *Maple Flooring* are not applicable where "'each defendant on receiving . . . [a price request] usually furnished the data with the expectation that is would be furnished reciprocal information when it wanted it.  That concerted action is of course

The Court finds no merit to Plaintiff's argument. The Supreme Court has determined that exchanges of credit information similar to those alleged here[26] do not constitute a violation of §1 of the Sherman Act, so long as the information exchanged does not include any recommendations or agreement as to how the exchanged information should be used. *Cement Manufacturers,* 268 U.S. at 599-600, 606; *Maple Flooring,* 268 U.S. at 586. Indeed, the Antitrust Division of the Department of Justice (the "Department") has consistently approved the exchange of credit information through a third party where the exchange does not involve the terms on which the firms conduct their business or make any recommendations regarding the information exchanged.[27] *See, e.g., Experience Info. Bureau, Inc.,* DOJ Business Review Letter, B.R.L. 92-1, 1992 WL 71827 (D.O.J. Jan. 14, 1992) (approving information clearinghouse for underwriters of credit life and disability insurance); *Nat'l Ass'n of Credit Mgmt.,* DOJ Business Review Letter, B.R.L. 94-3, 1994 WL 70278 (D.O.J. Feb. 16, 1994) (approving association's creation of new department to offer credit information services to businesses in leasing industry); *Nat'l Telecomm. Data Exch., Inc.,* DOJ Business Review Letter, B.R.L. 94-6. 1994 WL 70279 (D.O.J. Mar. 8, 1994) (approving credit information clearinghouse for telecommunications

---

sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act.'" Pl.'s Mem. in Opp'n at 17 n. 3, ECF No. 63 (quoting *Container Corp.,* 393 U.S. 333 (1969)). Plaintiff's reliance on *Container Corp.* is misplaced. Unlike the exchange in that case, here there was no exchange of pricing information, a critical fact, nor do the factual allegations here show or suggest an understanding or expectation of a reciprocal exchange of pricing information.

[26] Essentially, the business practice challenged by Plaintiff as violating federal antitrust laws can be summarized as follows. Lenders report negative events (such as late payments, exceeding credit limits/too high balances, default, arrearages, and foreclosures), as they occur in their customers' accounts, to credit bureaus which compile credit histories and provide that information to credit scoring companies, who in turn use that information, along with algorithms, to convert this information into a credit score. The recalculated credit scores are then distributed via the credit bureaus to the lenders, which use the recalculated credit scores to adjust their customers' credit terms/limits.

[27] Upon request, the Antitrust Division will issue a business review letter pursuant to 28 C.F.R. §50.6 stating the Department's antitrust enforcement intentions with regard to the requesting organization's proposed business operation.

carriers); *Mortg. Indus. Data Exch.*, DOJ Business Review Letter, B.R.L. 94-18, 1994 WL 532704 (D.O.J. Sept. 22, 1994) (approving information clearinghouse for mortgage industry); *Telecomm. Data Exch.*, DOJ Business Review Letter, 1997 WL 543106 (D.O.J. Sept. 3, 1997) (approving consumer credit information clearinghouse for telecommunications carriers).

Plaintiff concedes, as she must, that the sharing of customer information regarding creditworthiness is lawful under the antitrust laws. Pl.'s Mem. in Opp'n at 11, 16-17, ECF No. 63. Plaintiff further concedes that the use of credit scores to assess a borrower's loan eligibility, *i.e.,* creditworthiness, is a potentially lawful use of the data. *Id.* at 10. What is not lawful, Plaintiff contends, is the linking of a pricing model (credit score) to the credit reporting system. However, in order for Plaintiff's argument to have any merit, the factual allegations would have to show or suggest that the information exchanged, in particular, the credit scores, included a recommendation or agreement to link loan prices and/or credit terms to certain credit scores, and no such inference can be drawn from the factual assertions in Plaintiff's complaint. At most, those factual assertions show or suggest that lenders unilaterally use credit scores to evaluate and make decisions regarding customers' credit, a perfectly lawful use. In addition, the exchange of credit information and credit scores serves a perfectly legitimate business function—to reduce losses by providing information that aids the unilateral decision-making of the lenders. To this end, it has been reported that said reductions will result in a "pro-competitive effect; it . . . enhance[s] efficiency and lower[s] operating costs, thereby increasing output." *Mortg. Indus. Data Exch.*, 1994 WL 532704. Therefore, the Court finds that an exchange of such information does not violate §1 where, as here, any action taken in reliance upon it is the result of each Defendant's independent judgment, and not of agreement. *Michelman,* 534 F.2d 1048.

Perhaps realizing this infirmity, Plaintiff attempts to prove that concerted action exists by arguing that the effect of the exchange of customers' credit information and use of a uniform credit score is price stabilization, which could only result if Defendants agreed to fix the price of loans based on credit scores. In *Maple Flooring,* the Supreme Court rejected a similar argument made by the government which maintained that the exchange of information resulted in maintenance of practical uniformity in net delivered prices. 268 U.S. at 567. The Supreme Court opined that "[p]ersons who unite in gathering and disseminating information . . . and statistics . . . as to the amount of production of commodities in interstate commerce, and who report market prices, are not engaged in unlawful conspiracies in restraint of trade *merely because the ultimate result of their efforts may be to stabilize prices* or limit production through a better understanding of economic laws and a more general ability to conform to them." *Id.* at 584 (emphasis added). The Supreme Court found determinative the fact that the government had neither alleged nor proved that any agreement existed among the association's members affecting production, fixing prices, or for price maintenance. *Id.* at 567.

Moreover, in cases involving the exchange of information, price stabilization may result from factors that do not constitute an antitrust violation, such as obtaining "a better understanding of economic laws and a more general ability to conform to them, for the simple reason that the Sherman [Act] neither repeals economic laws or nor prohibits the gathering and dissemination of information." *Maple Flooring,* 268 U.S. at 585. Thus, the presence of price stabilization alone cannot prove concerted action on the part of the alleged conspirators. Having failed to aver facts to show or suggest an agreement among the Defendants to use credit scores for an improper purpose under the Sherman Act, Plaintiff's Complaint does not state a plausible §1 claim.

Another flaw in Plaintiff's argument is that the factual allegations in her Complaint do not show or suggest that the information exchanged involved credit terms or pricing used by the lenders in their consumer loan/credit card businesses. Plaintiff admits that "[w]hile actual prices may not be traded in the instant case, a price proxy in the form of a 'credit score' is created. (Compl. ¶ 36)." Pl.'s Mem. in Opp'n at 17 n. 3, ECF No. 63. In other words, Plaintiff is attempting to equate the term "credit score" to a "pricing model." This argument is equally unavailing, as there is simply no support in the law or facts for Plaintiff's position. It is clear that credit scores do not contain any pricing elements, such as interest rates or credit terms.[28] As the Federal Reserve Board reported to Congress in 2007, "[c]redit scoring[, which] is a statistical technology that quantifies the credit risk posed by a prospective or current borrower[,] . . . is widely used to evaluate applications for credit, identify prospective borrowers, and manage existing accounts." Bd. of Governors at 1. The Supreme Court's decision in *Catalano* illustrates this point. In that case, the elimination of discounts was considered a quantitative element of the price, because the price charged to the beer distributors was increased as a direct result of the elimination of discounts. Consequently, the wholesalers' agreement to eliminate the discounts was found to be an unlawful price fixing agreement. *Catalano,* 446 U.S. at 648. By contrast here, the same cannot be said of the credit information and credit scores exchanged between the Lenders, Credit Bureaus, and Credit Scoring Cos., as neither the credit information nor scores constitutes a quantitative element of the price of consumer credit. Another important distinction between *Catalano* and the case at bar is that an agreement to eliminate the discounts

---

[28] Nor does the credit information provided by the lenders to the credit bureaus constitute "pricing information" or "credit terms." The information provided by lenders consist of events that relate to a customer's creditworthiness—i.e., untimely repayment, high outstanding loan balances, loan default, arrearages, foreclosures, etc. This creditworthiness information is not a pricing point or model.

had been established in *Catalano*; no such agreement has been established, or can be inferred, from the facts as pled in this case.

Significantly, the distinction between credit information and price was aptly noted by the district court in *Metro Video*:

> [U]nder the federal antitrust laws decisions involving credit have always required and produced totally different analyses from those involving prices. This is why decisions regarding agreements pertaining to prices and exchanges of price information have consistently been held to violate the Sherman Act, while at the same time it has long been held that the exchange of information between competitors regarding the credit worthiness of customers does not violate any provision of the federal antitrust laws. In *Cement Manufacturers*, the Supreme Court specifically stated that "[d]istribution of information as to credit and responsibility of buyers undoubtedly prevents fraud and cuts down to some degree commercial transactions which would otherwise be induced by fraud," so it cannot be declared to be an unlawful restraint of trade "even though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned." As long as the exchange of credit information is not accompanied by any agreements relating to the extension of credit, such as an agreement to deny credit to one or more of the competitors' customers, no violation of the antitrust laws has occurred.

1990 WL 58463, at *9 (internal citations omitted). Thus, for these and the reasons stated above, the Court finds no basis exists for equating "credit scores" to "pricing."

Finally, it bears mentioning that a key factor in the Supreme Court's decision in *Cement Manufacturers* was the reason for the exchange of customer credit history information—to prevent procurement of fraudulent contracts. 268 U.S. at 604. Similarly here, credit history information, including credit scores, have been exchanged to provide critical information regarding a customer's creditworthiness, to assist lenders in gathering information necessary to protect themselves against fraudulent or insolvent customers or potential customers. Therefore,

inasmuch as the exchange of information here does not include any pricing terms or pricing model, the Court finds that *Cement Manufacturers* controls the outcome here.

In further support of their argument that the exchange of credit information here was entirely lawful, Defendants submit that the lawfulness of exchanges of credit history information is so fully accepted as a matter of law that the reporting of consumer credit histories to credit reporting agencies and the dissemination of credit reports for the purpose of determining whether to extend credit to individual consumers is permitted, and indeed encouraged, by the federal Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* ("FCRA"). Lenders' Mem. at 13, ECF No. 34. Defendants further submit that in light of federal banking regulations, specifically 12 C.F.R. §7.8004, authorizing the exchange of credit reports containing consumer credit history information, it would be inappropriate to apply the antitrust laws to prohibit lenders, credit reporting bureaus, and credit scoring agencies from sharing consumer credit history information, or to allow a factfinder to infer an unlawful conspiracy from allegations of the lawful sharing of consumer credit history information. Lenders' Mem. at 14, ECF No. 34. According to Defendants, allowing Plaintiff to predicate her antitrust conspiracy claim on factual allegations that Defendants did precisely what Congress has authorized them to do would be plainly repugnant to the language and purpose of the FCRA and federal banking regulations. *Credit Suisse Sec. (USA) LLC v. Billing,* 551 U.S. 264, 267-68 (2007) (where there is a "plain repugnancy" between the antitrust laws and another federal statutory scheme, the other statutory scheme implicitly precludes the application of the antitrust laws to the alleged conduct). Lenders' Mem. at 14-15, ECF No. 34.

In enacting the FCRA, Congress recognized the need for fair and accurate credit reporting in the banking system, respect for consumers' rights to privacy, and the vital role

consumer reporting agencies have assumed in collecting and evaluating consumer credit and other information on consumers.   15 U.S.C. §1681(a)(1), (3), & (4).   Congress also acknowledged the existence of an elaborate mechanism for "investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." 15 U.S.C. § 1681(a)(2) (footnote omitted).  With these purposes in mind, Congress delineated a finite list of circumstances under which consumer credit information may be disseminated.   Of particular relevance to this case are the circumstances set forth in §1681b(a)(3):

> [A]ny consumer reporting agency may furnish a consumer report . . . [t]o a person which it has reason to believe—
>
> > (A)  intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
> >
> > (B)  intends to use the information for employment purposes[.]
>
> . . .

15 U.S.C. §1681b(a)(3)(A) & (B).  In addition, federal banking regulations governing consumer lending provide that a "national bank shall not make a consumer loan . . . without regard to the borrower's ability to repay the loan.   A bank may use any reasonable method to determine a borrower's ability to repay, including, for example, the borrower's current and expected income, current and expected cash flows, net worth, other relevant financial resources, current financial obligations, employment status, credit history, or other relevant factors."  12 C.F.R. § 7.4008(b).

Plaintiff responds that by adding a pricing score to the otherwise neutral credit information in credit reports, the Defendants have engaged in a price fixing scheme that clearly

is not a legitimate business use of credit information under the FCRA. According to Plaintiff, price fixing, price stabilization, or any other form of price manipulation do not fall within one of the five limited and specific circumstances delineated by Congress, pursuant to 15 U.S.C. §1681b(a), in which credit information may be provided. Pl.'s Mem. in Opp'n at 13, ECF No. 63. Plaintiff's argument is unavailing, as it presumes that credit scores are the equivalent of "pricing," which this Court has already determined to be completely unfounded. In addition, although the Court agrees that price fixing is not one of the circumstances enumerated in §1681b(a), as explained above, the factual allegations in the Complaint do not support the suggestion that credit information and credit scores were disseminated for the improper purpose of fixing prices.

Next, Plaintiff contends that the cited language from §7.4008(b) of the federal banking regulations presumes that each competing bank will make their own independent analysis of the facts, and not adopt a uniform model among competitors for pricing customers. According to Plaintiff, Defendants ignore this limitation because after the determination of creditworthiness is made, lenders then engage in loan re-repricing based on the uniform credit score which has nothing to do with creditworthiness, since there is no lender risk once the loans are underwritten by insurance such as credit-swap derivatives. Pl.'s Mem. in Opp'n at 15, ECF No. 63.

Again, Plaintiff's argument misses the mark. Black has failed to allege any facts showing or suggesting that Defendants adopted a uniform *pricing* model. Furthermore, there is nothing improper about lenders adjusting credit terms and rates upon receipt of an updated credit score, so long as the adjustment is based on unilateral decision-making by each lender, and nothing in Plaintiff's Complaint suggests otherwise. In addition, the website sources cited by Plaintiff show

that the credit score and creditworthiness are related.[29]   Indeed, VantageScore's website, quoting Fitch Ratings with regard to the secondary market, states: "VantageScore provides highly predictive evaluations of consumer creditworthiness."   VANTAGESCORE, http://www.vantagescore.com/about/marketadoption/ (last visited 8/09/11).   Finally, Plaintiff's contention that there is no lender risk once the loans are underwritten by insurance (such as credit-swap derivatives) is wholly conclusory and not supported by the factual allegations.

Next, Plaintiff submits that despite the statute's directive to analyze the facts independently, credit bureaus and credit scoring agencies have collaborated to create a uniform industry pricing model.   Plaintiff further submits that "[s]uch industry-wide uniformity for making lending decisions is even touted as an advantage in Credit Score Defendants' product literature:  'VantageScore is the generic credit scoring created by America's three major credit reporting companies [named defendants, Experian, Trans Union, and Equifax].   Our highly predictive model uses an innovative, patent-pending scoring methodology *to provide lenders with a consistent interpretation of consumer credit files* (emphasis added).'"   Pl.'s Mem. in Opp'n at 15, ECF No. 63 (quoting Barrett Burns, President & CEO, VantageScore Solutions LLC, VantageScore Newsletter, Oct. 20, 2010).   Plaintiff maintains that this consistent

---

[29] At its very essence, the credit score is a predictor of a borrower's risk of default.  It is touted by VantageScore as a "highly predictive, generic consumer credit risk model . . . [that p]redicts the likelihood of future serious delinquencies (90 days late or greater) on any type of account." VANTAGESCORE, http://www.vantagescore.com/about/vantagescore_methodology/ (last visited 8/09/11). According to VantageScore's website, credit scores are used by lenders to determine whether to extend credit and the terms of such credit.  *Id.*, http://www.vantagescore.com/benefits/consumers/ (last visited 8/09/11).  A consumer's VantageScore is derived from a mathematical formula that evaluates a number of credit-related characteristics, including:  Payment history, credit utilization, depth of credit, balances, recent credit, and available credit.  *Id.,* http://www.vantagescore.com/faqs/consumer/ (last visited 8/09/11).  Along with the credit score, lenders also consider a number of other factors including whether a borrower is likely to improve, deteriorate, or remain stable in terms of their credit score by closely examining credit reports, specifically, the amount of credit utilization.  *The Score*, VANTAGESCORE  at 5 (Apr. 26, 2011), http://www.vantagescore.com/docs/newsblast_pdfAPR28.pdf.

interpretation is intended to, and does, lead to consistent pricing in which lenders lose any competitive advantage in their ability to analyze data, but because the credit score consistently fixes the terms of the loans, lenders can make up for the loss of competition by adopting the same recommended credit pricing model, which yields monopolistic profits. *Id.* at 15-16. Thus, Plaintiff submits that Defendants are acting outside the scope of the FCRA, which is the reason the instant Complaint was filed. *Id.* at 16.

The Court finds no merit to any of these arguments. First, the alleged collaboration between the Credit Bureaus and Credit Scoring Companies to create a uniform industry pricing model is based on the erroneous assumption that the credit score or scoring model is the equivalent of a *pricing* model. However, as explained above, the credit score and/or scoring models generated by VantageScore and FICO are not pricing models. This is evident from a perusal of the excerpts from VantageScore's and FICO's websites as provided by Plaintiff.[30] Moreover, the Court does not find any "directive" in the FCRA that *credit reporting agencies* are to independently analyze the facts. Rather, the FCRA requires that the credit reporting agencies accurately and fairly report, collect and evaluate consumer credit information. And it appears from VantageScore's website that its patent-pending scoring model does just that, as it allegedly reduces the variance between the credit scores of the three credit reporting agencies, and thus, produces a more accurate and consistent score. There is nothing unlawful about the exchange of customers' credit history information between the Credit Bureaus and Credit Scoring Companies so that the latter can generate a *scoring* model, as opposed to a *pricing* model, as the former

---

[30] *See, e.g.,* Pl.'s Exs. B & C, ECF Nos. 63-2 & 63-3; Pl.'s Exs. D, E, F, & G, ECF Nos. 64-4 - 64-7.

clearly falls within the purview of §1681b(a)(3). Likewise, the Court cannot glean any improper motive from VantageScore's representation on its website that its scoring methodology provides lenders with consistent interpretations of consumer credit files. A review of the website excerpts provided by Plaintiff reveals that the purpose behind VantageScore's scoring model is developing a statistically sound, and therefore reliable and accurate, prediction of a consumer's credit risk or creditworthiness. VantageScore represents that its scoring model is more accurate and reduces the variance in credit scores between credit reporting agencies. It is clear that VantageScore's scoring model is purely a risk assessment. Moreover, it is in complete accord with the purpose of the FCRA—to ensure accuracy and fairness in credit reporting. 15 U.S.C. §1681. The fact that VantageScore's scoring model may have a stabilizing effect on price does not give rise to a Sherman Act violation without some evidence of an agreement between lenders to offer the same credit terms and interest rates for certain credit scores without any independent evaluation of a consumer's facts and credit history. *Maple Flooring,* 268 U.S. at 585. And as this Court found above, no such agreement can be inferred from the facts alleged in Plaintiff's Complaint. Accordingly, the Court finds no merit to Plaintiff's argument that Defendants are acting outside the scope of the FCRA.

Therefore, because Plaintiff has failed to allege facts that show or suggest that the exchange of credit information and credit scores was accompanied by an agreement to use that information improperly, *i.e.,* to fix the price of credit, the Court finds that the Complaint fails to state a plausible §1 violation under the Sherman Act.

### 4.    Leave to Amend the Complaint

In the alternative, Plaintiff has summarily requested leave to amend her Complaint. For the reasons set forth below, the Court recommends that Plaintiff's request for leave to amend her

complaint be denied.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." In *Foman v. Davis,* the Supreme Court delineated the grounds that would justify denying leave to amend: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment". *Foman v. Davis,* 371 U.S. 178, 182 (1962). The grant or denial of leave to amend is within the sound discretion of the district court; however, failure to provide a reason for denying leave to amend is considered an abuse of that discretion. *Id.*; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434 (citing *Foman, supra*).

The proper procedure for amending a complaint, in non-civil rights cases, is set forth in Fed.R.Civ.P. 15(a)(1): "A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed.R.Civ.P. 15(a)(1)(A) & (B) (effective Dec. 1, 2009). However, after the expiration of the time set forth in Rule 15(a)(1), a party may amend its pleading prior to trial only with the opposing party's written consent or with leave of court. Fed.R.Civ.P. 15(a)(2). Rule 15(a)(2) further provides that leave to amend should be freely given when justice requires.

Where leave of court is required to amend the complaint, the plaintiff must request leave to amend <u>and</u> attach the proposed amended complaint to the request. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252 (3d Cir. 2007) (citing *Kelly v. Del. River*

*Joint Comm'n,* 187 F.2d 93, 95 (3d Cir. 1951)).[31]  Failure to attach the proposed amendment is fatal to the request.  *Id.* at 252-53; *see also Ranke v. Sanofi-Synthelabo Inc.,* 436 F.3d 197, 206 (3d Cir. 2006) (citing *Ramsgate Court Townhome Ass'n v. West Chester Borough,* 313 F.3d 157, 161 (3d Cir. 2002)).

The Court finds that Plaintiff has not properly requested leave to amend her Complaint. Plaintiff did not file an amended complaint as a matter of course within 21 days after service of Defendants' motions to dismiss under Rule 12(b)(6).  Therefore, Plaintiff is required to follow the procedure set forth under Rule 15(a)(2), as further delineated in *Fletcher-Harlee.*  This she did not do.  On November 18, 2010, Plaintiff summarily requested, in the alternative, leave to amend her Complaint in her responsive brief to Defendants' motion to dismiss.  *See* Pl.'s Mem. in Opp'n at 24, ECF No. 63.  However, she has failed to indicate in her responsive brief what additional facts she would allege in her amended complaint to adequately plead a §1 antitrust claim, nor did she indicate at oral argument on Defendants' motions to dismiss what additional facts she would allege in support of her antitrust claim.  Most importantly, she has failed to provide the Court with a proposed amended complaint.  This is fatal to her request for leave to amend the complaint.  *Fletcher-Harlee,* 482 F.3d at 252; *see also Burtch v. Milberg Factors, Inc.,* Civ. A. No. 07-556-JJF-LPS, 2009 WL 1529861, *3 (D. Del. May 31, 2009) (declining to grant leave to amend the complaint in an antitrust action for failing to present a proper request for leave to amend) (citing *Fletcher-Harlee,* 482 F.3d at 252).  As the court of appeals opined in

---

[31] In *Fletcher-Harlee,* the version of Rule 15 in effect at the time of the court of appeals' decision was the pre-2009 amendment version, which allowed a plaintiff to amend a complaint once as a matter of right up to the point at which the district court grants the motion to dismiss and enters final judgment, since a motion to dismiss is not a responsive pleading and the time limit applied only to responsive pleadings. After the motion to dismiss is granted and final judgment is entered, a plaintiff may seek to amend the complaint only through Fed.R.Civ.P. 59(e) or 60(b). *Id.* (citing *Kelly, supra*).

*Fletcher-Harlee,* "we hold that in ordinary civil litigation it is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint."

In addition, and perhaps more importantly, the Court finds that it would be futile to allow Plaintiff to amend her Complaint. Plaintiff has failed to proffer to this Court any additional facts to show a plausible antitrust claim, in particular, that there was an agreement among the Defendants to engage in unlawful conduct under §1 of the Sherman Act. Moreover, it is clear from Plaintiff's responsive brief and sur-reply that in order to prove the alleged antitrust violation here, she is relying on this Court agreeing with her that "credit scores" are the equivalent of "pricing." Having found against Plaintiff on this legal issue, the Court cannot envision any facts that would show or suggest a plausible §1 antitrust claim.

Therefore, for the reasons set forth above, the Court recommends that Plaintiff's request for leave to amend her complaint be denied.

### D. <u>Credit Bureaus' Motion to Dismiss</u>

Defendants Experian Information Solutions, Inc., Trans Union LLC, and Equifax Credit Information Services, Inc. (collectively, the "Bureau Defendants"), have also moved to dismiss the Complaint in its entirety for failure to state a claim pursuant to Rule 12(b)(6). In support of their motion, the Bureau Defendants submit that the Complaint fails to adequately allege an unlawful agreement and plausible conspiracy as required under *Twombly.* The Bureau Defendants further contend that their actions are lawful and authorized by the FCRA, and that the FCRA impliedly precludes enforcement of the antitrust laws as sought by Plaintiff. The Court will address each of these arguments below.

### 1. The Sufficiency of Plaintiff's Allegations As to Bureau Defendants

In her Complaint, Plaintiff sets forth several averments directed specifically to the Bureau Defendants. In this regard, Plaintiff alleges that credit bureaus "act as market associations within the context of antitrust law" because they "use private and sensitive data among marketplace competitors" and "actively promote and derive profit from assisting all of the competitors in the industry." (Compl., ¶32.) Plaintiff posits that "[m]arket associations can be effective tools for monopolizing industries by acting as an information clearing house for coordinating pricing information and boycotts. Credit bureaus act as information clearing houses holding proprietary data on over 1 billion debtors internationally." (Compl., ¶33.)

According to Plaintiff, the credit bureaus "further the price fixing scheme among lenders because they assist and promote parallel action among competitors. Specifically, where one company reports a negative event, the credit bureau(s) alert all of the lenders to either boycott the debtor by foreclosing access to any further loans or increase interest rates. Thus, consumers are forced to either submit to higher monopolistic prices or default and thereby be excluded from the credit market for at least seven years." (Compl. ¶34.) In addition, Plaintiff alleges that "Credit bureaus also assist in providing instantaneous real-time monopolistic pricing. Because the database information is shared in real time, the lenders can increase prices or institute boycotts with unparalleled efficiency." (Compl., ¶35.)[32]

---

[32] The Court finds that as to the allegations contained in paragraphs 32-35 of the Complaint, "because they are no more than conclusions, [they] are not entitled to the assumption of truth." *Iqbal,* 129 S.Ct. at 1950. In some instances, Plaintiff combines a conclusion with a hypothesis or theory not directed to any named defendant. *See* Compl. ¶33 ("Market associations *can be* effective tools for monopolizing industries by acting as an information clearing house for coordinating pricing information and boycotts."); *see also* Compl. ¶35 ("Because the database information is shared in real time, the lenders *can* increase prices or institute boycotts with unparalleled efficiency."). Moreover, other than the reference to Equifax in the JP Morgan letters, there are no facts alleged in the Complaint suggesting communications between

The Bureau Defendants submit that Plaintiff's allegations fail to satisfy the pleading requirements of *Twombly,* and join in and incorporate by reference the Lender Defendants' motion to dismiss and memorandum of law in support thereof. The Bureau Defendants also advance two arguments of their own. First, the Bureau Defendants contend that Plaintiff has utterly failed to allege a conspiracy theory that is plausible as to them. In support, the Bureau Defendants argue that when the proper standard is applied to Plaintiff's Complaint, even a cursory review of the allegations exposes them as inadequate. Second, the Bureau Defendants submit that Plaintiff has failed to allege virtually any facts at all regarding the alleged conspiracy, let alone facts plausibly suggesting that they reached any agreement to take actions they do not even perform, *i.e.,* setting interest rates and other credit terms.

With regard to their argument that Plaintiff has failed to allege a conspiracy theory that is plausible as to them, the Bureau Defendants argue mainly that there are no allegations indicating or suggesting what benefit they would receive from participating in a conspiracy to restrict the supply of loans. The Bureau Defendants submit that if anything, they would have nothing to gain and much to lose from a scheme to shrink their downstream credit-reporting revenue by limiting the availability of credit. The conspiracy as alleged by Plaintiff would decrease the number of loans and thereby decrease the number of credit reports used and sold. Thus, agreeing to restrict loan output, or supporting such agreement, makes no sense for a credit bureau. Moreover, the Bureau Defendants maintain that Plaintiff fails to provide a credible explanation

---

the Bureau Defendants and the other Defendants, that support the allegation in paragraph 34 that the "credit bureau(s) alert all of the lenders to either boycott the debtor by foreclosing access to any further loans or increase interest rates." In addition, the reference to Equifax in the JP Morgan letters does not give rise to the suggestion or inference that the Equifax alerted JP Morgan to boycott Plaintiff by foreclosing access to any further loans or increase interest rates. Rather, the JP Morgan letters indicate that Equifax merely provided credit information to JPMorgan. *See* discussion, *supra,* at 22-24.

or even allege why they would agree to participate in a conspiracy to fix the terms of products they do not sell, when clearly they do not receive revenue from interest rates. Because the banking system is dependent upon fair and accurate credit reporting, the Bureau Defendants maintain lenders would purchase credit data from them regardless. By participating in a conspiracy, the Bureau Defendants would needlessly risk antitrust penalties for revenue they would receive anyway. Thus, because Plaintiff has failed to allege a plausible motive for the Bureau Defendants to participate in a conspiracy, the Complaint against them should be dismissed.

In response to the Bureau Defendants' implausibility argument, Plaintiff submits that their argument is factually untrue. Pl.'s Mem. in Opp'n to Bureau Defs.' Motion to Dismiss at 7, ECF No. 60 ("Pl.'s Mem. in Opp'n to Bureau Defs."). According to Plaintiff, the Bureau Defendants solely own VantageScore, thus making it their agent, and VantageScore sells credit scores which are used by lenders to set lending terms. Plaintiff further theorizes that VantageScore's revenues accrue solely to the Bureau Defendants, and therefore, the profitability of the Bureau Defendants rests, at least in part, on lenders adopting the VantageScore "pricing model." Consequently, Plaintiff submits, the Bureau Defendants through their agent, VantageScore, will more than make up for "the lost revenues due to decreased lending by deriving revenues from the lenders who adopt the proprietary, consistent, and uniform pricing system [known as] VantageScore®." *Id.*

The Court finds that Plaintiff's argument in response is flawed in several respects. Plaintiff does not explain what facts are untrue. Indeed, Plaintiff does not appear to be disputing that a credit bureau would be harmed by a conspiracy to limit the availability of credit, which would reduce the use of credit reports, thereby lowering the credit bureaus' revenue. Rather,

Plaintiff argues that the Bureau Defendants "compensate" for these lost revenues "by deriving revenues from lenders who adopt . . . VantageScore scores." This argument ignores the fact (previously admitted) that if lending decreases, there will be less demand for the VantageScore scores, and therefore, revenue from the sales of VantageScore scores will also decrease. The Court agrees with the Bureau Defendants that it is highly unlikely they would enter into a conspiracy in which they would needlessly risk antitrust penalties and from which they would not benefit. Therefore, the Court finds Plaintiff's conspiracy theory, as it relates to the Bureau Defendants, implausible.

Plaintiff's argument is also flawed to the extent she attempts to establish antitrust liability as to the Bureau Defendants based solely on their ownership of VantageScore. As the Supreme Court recognized:

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Thus, it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders."

*United States v. Bestfoods,* 524 U.S. 51, 61 (1998) (internal citations omitted); *see also Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484 (3d Cir. 2001) (citing *Bestfoods,* 524 U.S. at 69; other citation omitted) (when the shareholder is another corporation, mere ownership of a subsidiary does not justify the imposition of liability on the parent).[33] This principle has been

---

[33] However, where it has been demonstrated that the corporate form has been abused, courts will allow the corporate veil to be pierced and liability imposed on the corporation's shareholders. *Pearson,* 247 F.3d at 484 (citing *Publicker Indus., Inc. v. Roman Ceramics Corp.,* 603 F2d. 1065, 1069 (3d Cir. 1979)). In making this determination, the courts apply the "alter ego" test, which requires an inquiry into whether

applied in the context of antitrust cases. *In re Pa. Title Ins. Antitrust Litig.,* 648 F.Supp.2d 663, 687 (E.D.Pa. 2009) (citations omitted) (holding plaintiffs cannot rely merely on parent companies' ownership interest in their respective subsidiaries to maintain a §1 claim against parent defendants). Therefore, in order to state a §1 claim against parent corporations, a plaintiff "must set forth facts establishing the parent corporations' direct and independent participation in the alleged conspiracy." *Id.* at 688 (citing *McCray v. Fidelity Nat'l Title Ins. Co.,* 636 F.Supp.2d 322, 334 (D.Del. 2009); *In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F.Supp. 2d 363, 375-77 (M.D.Pa. 2008); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.,* ("*NIPP*"), 311 F.Supp. 2d 1048, 1068-69 (D. Colo. 2004)). However, assertions that the parent corporations participated in the antitrust conspiracy by giving their assent and approval to the subsidiary's conduct, and through their ownership and control of their subsidiary, amount to nothing more than conduct "typical of any parent and subsidiary," and thus, are insufficient to state a §1 claim against the parent corporations. *Id.* at 688-89 (citing *Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 857 & n. 12 (10th Cir. 1999)). A limited liability company formed under Delaware law, such as VantageScore, "is treated for liability purposes like a corporation." *Wellman v. Dow Chem. Co.,* Civ. No. 05-280, 2007 WL 842084, at *2 (D.Del. Mar. 20, 2007) (citing 6 Del. C. §18-303).

In the case at bar, Plaintiff has not alleged any facts to suggest anything but

---

the subsidiary is little more than a legal fiction, and consideration of the following factors: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Id.* at 484-85(citing *Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.,* 736 F.2d 879, 886 (3d Cir. 1984)). Plaintiff's Complaint does not contain any factual allegations even remotely suggesting any of the alter ego factors are present here.

"circumstances . . . typical of any parent and subsidiary."   For example, in paragraph 11 of the Complaint, Plaintiff asserts that "VantageScore is co-owned by Trans Union, Equifax, and Experian."[34]   In paragraph 12, Plaintiff alleges:  "Defendants, directly or through a division, subsidiary or agent, have had actual knowledge or, have knowingly participated in, the conspiracy to fix loan prices, including the restraint of availability of consumer loans."  (Compl., ¶12.)  Disregarding for the moment the fact that paragraph 12 contains conclusory statements which are not considered on a motion to dismiss, Plaintiff alleges nothing more than the Bureau Defendants possessed knowledge of, and/or acquiesced in, the alleged conspiratorial conduct of their subsidiary, VantageScore.   As the district court concluded in *In re Pennsylvania Title Insurance*:

> Because plaintiffs allege that parents merely acquiesced in their subsidiaries' conduct, the complaint lacks the "specific [allegations] of coordinated activity," [*Mitchael,* 179 F.3d] at 857, that shows that parents directed, controlled, or encouraged their subsidiaries' participation in the [price fixing] scheme, *NIPP*, 311 F.Supp.2d at 1070.  Although plaintiffs need not present detailed allegations, plaintiffs here rely on general statements that barely rise above mere labels and conclusions and thus hardly raise a right to relief above a speculative level. *Twombly*, 550 U.S. at 555.

648 F.Supp. 2d at 689; *see also In re Pressure Sensitive,* 566 F.Supp. 2d at 376 (holding knowledge of the existence of an agreement between the subsidiary and other alleged co-conspirators does not support an inference that the parent company was a co-conspirator).  Here too Plaintiff's Complaint lacks specific allegations of coordinated activity that shows the Bureau

---

[34] VantageScore is a Delaware limited liability company, and is owned by the three Bureau Defendants, two of which are corporations (Experian and Equifax), and the other (Trans Union) is a Delaware limited liability company.  Compl., ¶¶ 7-9, 11.

Defendants directed, controlled or encouraged VantageScore's participation in the alleged conspiracy.

Plaintiff's attempt to predicate the Bureau Defendants' liability on an alleged agency relationship with VantageScore is equally unavailing. Conclusory allegations of agency based merely on the parent corporation's ownership of a subsidiary without any facts suggesting an agency relationship are insufficient to establish the parent corporation's independent participation in the alleged conspiracy. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 513 F.Supp. 1100, 1297 (E.D.Pa. 1981), *rev'd in part on other grounds* 723 F.2d 238 (3d Cir. 1983), *rev'd* 475 U.S. 574 (1986). In *Zenith Radio,* the plaintiff attempted to establish an antitrust conspiracy between eight principal corporations and their sales subsidiaries based merely on corporate affiliation. *Id.* at 1297. In rejecting this argument, the district court noted the principles relevant to deciding whether a subsidiary is the agent of its parent corporation: "'Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact. The central factual issue is control, i.e., whether the parent corporation dominates the activities of the subsidiary.' . . . However, the mere fact that one corporation owns a controlling interest in another does not render the subsidiary the agent of the parent[.]" *Id.* (quoting *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.,* 456 F.Supp. 831, 840-41 (D.Del. 1978)). The district court further explained: "'A corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other....' Nor does the fact that a parent and a subsidiary have common officers and directors necessarily indicate an agency relationship." *Id.* (quoting *Japan Petroleum,* 456 F.Supp. at 841 (quoting RESTATEMENT (SECOND) OF AGENCY §14 M)). Likewise, activities that constitute standard parent-subsidiary interactions, such as the parent corporation appointing the

subsidiary's "officers and directors, influenc[ing] executive compensation, approv[ing] budgets, gather[ing] information about corporate performance, and receiv[ing] distributions of subsidiary profits[,] . . . do not reflect daily, operational control that is the sine qua non of an alter ego relationship." *In re Chocolate Confectionary Antitrust Litig.*, 674 F.Supp. 2d 580, 599-600 (M.D.Pa. 2009) (citations and footnote omitted). In the case at bar, other than labeling VantageScore as the "agent" of the Bureau Defendants, Plaintiff has failed to assert any facts suggesting the operational control necessary to raise an inference of an agency relationship between them. Thus, to the extent Plaintiff's antitrust claim against the Bureau Defendants is predicated on an alleged agency relationship with VantageScore, the Complaint fails to raise a right to relief above the speculative level. *Twombly,* 550 U.S. at 555.

The Bureau Defendants further argue that Plaintiff fails to allege that they know the credit terms that lenders offer consumers or that they agreed to fix such terms. Other than repeatedly leveling conclusory allegations of "collusion," "agreement," and "conspiracy" against them, the Bureau Defendants submit that Plaintiff has failed to plead sufficient facts such as a "specific time, place, or person involved in the alleged conspiracies." Rather, the Bureau Defendants submit the closest Plaintiff comes to alleging that they participated in any agreement is to contend that they "further the price fixing scheme among lenders because they assist and promote parallel action among competitors [by] alerting all of the lenders to either boycott the debtor or increase interest rates." However, the Bureau Defendants contend these are merely legal conclusions masquerading as factual allegations, and, in any event, parallel conduct in and of itself is legal. According to the Bureau Defendants, Plaintiff's Complaint describes what a credit bureau does and has always done—collect and distribute credit data—which is expressly

authorized by the FCRA, and thus, provides an obvious alternative explanation to participation in a conspiracy to fix loan prices.

In response to the Bureau Defendants' argument that the Complaint does not specifically allege that they themselves set prices, Plaintiff counters that they ignore the fact that the "Defendants together co-own and control VantageScore Solutions, LLC which licenses a credit pricing model for the lending industry." Pl.'s Mem. in Opp'n to Bureau Defs. at 5, ECF No. 60 (citing Compl., ¶¶11, 36). Plaintiff perceives that the Bureau Defendants "are arguing that because they participated in the conspiracy through an agent operating at their sole direction (VantageScore Solutions, LLC), the bureaus themselves should not be liable." *Id.* Plaintiff contends this perceived argument is misplaced as under antitrust laws, the inquiry is based on the substance of the scheme not the corporate structure used to obfuscate it. *Id.*

Plaintiff's argument lacks merit. Plaintiff is mistaken in her perception as the Bureau Defendants have not advanced any such argument. Indeed, Plaintiff's argument that the Court should look to the substance of the scheme is actually at odds with the position she is advancing against the Bureau Defendants vis a vis their ownership of VantageScore, which, in effect, asks this Court to elevate form over substance. In any event, as explained above, alleging merely ownership and control of a subsidiary is insufficient to establish a parent company's antitrust liability.

In her sur-reply, Plaintiff argues that the Complaint plainly states that VantageScore is owned exclusively by the Bureau Defendants, and that they "have direct knowledge [of] the conspiratorial acts." Pl.'s Sur-Reply to Bureau Defs. at 1, ECF No. 72. First of all, the Complaint asserts merely that "VantageScore is co-owned by Trans Union, Equifax and Experian." Compl., ¶11. Allegations of ownership or knowledge alone do not confer liability on

the individual members/owners of a limited liability corporation. *In re Pa. Title Ins.,* 648 F.Supp. 2d at 688; *In re Pressure Sensitive,* 566 F.Supp. 2d at 376. Perhaps realizing these infirmities, Plaintiff attempts to argue that the "Bureau Defendants admitted to cooperating closely together in creating the VantageScore Solutions credit pricing model." Pl.'s Sur-Reply at 1-2, ECF No. 72. Plaintiff gleans this so-called admission from an opinion filed in the United States District Court for the District of Minnesota, *Fair Isaac Corp. v. Equifax, Inc.,* Civil Action No. 06-4112, on a motion to compel production of VantageScore's credit scoring algorithm, and the software and process used in conjunction with the algorithm to produce a credit score. *Fair Isaac Corp. v. Equifax, Inc.,* Civ. A. 06-4112, 2007 WL 2791168, *1 (D. Minn. Sept. 25, 2007). However, a review of the cited memorandum opinion in *Fair Isaac* does not reveal any discussion of such an admission.[35] Even if the defendants in *Fair Isaac* had admitted to cooperating in developing the algorithm, those facts are not alleged in Plaintiff's Complaint, and even if they were, they would not be sufficient to suggest the Bureau Defendants directly and independently participated in the alleged conspiracy. Moreover, nowhere in the *Fair Isaac* opinion does the court or any party refer to or describe VantageScore's credit scoring algorithm as a credit *pricing* model. Thus, Plaintiff's argument that the Bureau Defendants were 'substantively involved in developing the pricing system, having direct and intimate knowledge of the [sic] how it is designed and implemented" is contrary to both fact and law.[36]

---

[35] Moreover, *Fair Isaac* is not even relevant to the instant dispute as *Fair Isaac* did not involve an antitrust claim, but rather, claims of unfair competition, false advertising under Lanham Act, misappropriation of trade secrets, breach of contract, and interference with contract.

[36] Plaintiff also quotes from a document she describes as the Bureau Defendants' Response in Opposition to Plaintiff's Motion to Compel, but no such document is found in the record at Western District of Pennsylvania, Docket No. 2:10-cv-848. Nor does Plaintiff provide a citation for the quoted material. Without a proper cite identify the source of the quote, the Court declines to consider the quoted material.

The remainder of Plaintiff's response in opposition to the Bureau Defendants' motion to dismiss consists of a reiteration of the arguments she made in response to the Lender Defendants' motion to dismiss, namely, that Plaintiff has pled direct evidence of an agreement,[37] as well as plus factors, in addition to parallel conduct, and that the Bureau Defendants' agent, VantageScore, admits and even recommends that lenders set their terms according to VantageScore's scoring model and not independent analysis of consumer's credit history. *See* Pl.'s Mem. in Opp'n to Bureau Defs. at 6-10, ECF No. 60. These arguments are unavailing for the same reasons stated in the Court's discussion of the Lender Defendants' motion to dismiss, namely, the Complaint lacks any factual allegations suggesting an agreement to unlawfully fix the price of consumer loans. *See* discussion *supra* at 16-33. In addition, Plaintiff argues that because the Bureau Defendants own VantageScore and VantageScore admits on its website that it "provide[s] lenders with a consistent interpretation of consumer credit files," the Bureau Defendants are implicated in the alleged price fixing conspiracy. Plaintiff's argument is completely unavailing as the Court has already found neither the Bureau Defendants' ownership of VantageScore, nor VantageScore's admission on its website, suggests unlawful conduct on the part of the Bureau Defendants. *See* discussion *supra* at 48-50; *see also In re Pa. Title Ins.,* 648 F.Supp. 2d at 687.

Finally, Plaintiff submits that the relationship between the Bureau Defendants and

---

[37] Plaintiff submits that she has presented actual evidence from which a conspiracy can be inferred with regard to Experian. Plaintiff points to the JP Morgan letters (attached as Exhibit A to the Complaint) which identify *Equifax,* not Experian, as the credit reporting agency who provided information upon which JP Morgan relied in making its decision to reduce the credit limit on Plaintiff's account. However, as discussed *supra* with regard to the Lender Defendants' motion to dismiss, the credit reporting agency's conduct was authorized by the FCRA, and therefore, entirely lawful. Therefore, the Court finds a conspiracy cannot be inferred from this "actual evidence" against any of the Bureau Defendants.

VantageScore is yet another plus factor that further satisfies the *Twombly* pleading requirement. Pl.'s Mem. in Opp'n to Bureau Defs. at 9-10, ECF No. 60. This argument also fails because the Bureau Defendants' ownership of VantageScore, in and of itself, does not constitute a plus factor, as it does not provide evidence that the Bureau Defendants either had a motive to enter into the alleged conspiracy or acted contrary to their interests, nor does it provide evidence implying a traditional conspiracy. *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d at 322. Accordingly, the Bureau Defendants' ownership in VantageScore does not constitute a "plus factor."

### 2. Lawfulness of Bureau Defendants' Conduct

In further support of their motion to dismiss, the Bureau Defendants submit that Plaintiff has failed to adequately allege that their concerted actions were illegal. The Bureau Defendants point to the FCRA, which expressly authorizes the conduct allegedly engaged in by the Bureau Defendants, *i.e.,* sharing of consumer credit data between credit bureaus and lenders. Specifically, the Bureau Defendants point to 15 U.S.C. §1681b(a)(3)(A) (also cited by the Lender Defendants), and §1681s-2 ("Responsibilities of furnishers of information to consumer reporting agencies"). Indeed, the Credit Bureaus argue, the FCRA actually encourages credit bureaus to share credit data, citing Congress' findings and statement of purpose in enacting the FCRA. *See e.g.,* 15 U.S.C. §1681(a)(1) & (3), §1681(b). Finally, the Bureau Defendants submit that the relevant case law, cited by the Lender Defendants in support of their motion to dismiss, puts to rest any lingering doubts about the legality of Defendants' conduct.

In response, Plaintiff acknowledges that sharing of credit history information is lawful under the FCRA, but submits that linking credit histories to pricing models termed "credit scores" is neither lawful nor authorized by the FCRA. Plaintiff further submits that the Bureau

Defendants "ignore the fact they control the pricing model through VantageScore."  Pl.'s Mem. in Opp'n to Bureau Defs. at 11, ECF No. 60.  In support, Plaintiff incorporates her response to the Lender Defendants' motion to dismiss on this point.

The Court agrees with the Bureau Defendants that their alleged conduct is lawful and authorized by the FCRA.  The Court rejects Plaintiff's argument that the Bureau Defendants also engaged in unlawful conduct by linking the credit histories to pricing models, which Defendants refer to as credit scores, for the same reason the Court rejected this argument in opposition to the Lender Defendants' motion to dismiss—Plaintiff's argument equates the term credit scores with pricing models, which this Court has determined to be completely unfounded.  *See* discussion *supra* at 39-44.  Accordingly, because Plaintiff has failed to allege facts to suggest the Bureau Defendants' alleged conduct is unlawful, the Complaint fails to state a §1 claim against the Bureau Defendants.

### 3.     Implied Preclusion of Plaintiff's Antitrust Claim

For their third and final argument in support of dismissing the Complaint, the Bureau Defendants argue that the FCRA precludes Plaintiff's attempt to use the Sherman Act to dismantle the credit reporting system.  The Bureau Defendants note that in her prayer for relief, Plaintiff requests the Court to enjoin Defendants "from sharing their customer data among themselves and their agencies."  (Compl., Prayer for Relief, ¶ vii.)  However, according to the Bureau Defendants, the relief Plaintiff seeks is inconsistent with the express authority under FCRA which governs such conduct.   For example, the Bureau Defendants submit the FCRA provides when and with whom credit bureaus may share credit data, 15 U.S.C. §1681b, and sets forth penalties for failing to comply with its provisions, 15 U.S.C. §621(b).  The FCRA vests the Federal Trade Commission (FTC) with the authority to enforce the FCRA with  respect to the

collection and distribution of credit data by credit bureaus. 15 U.S.C. §1681s(a). In support of their argument, the Credit Bureaus cite *United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 719 (1975), and *Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264, 275-76 (2007), for the proposition that conduct authorized by federal law is immune from antitrust liability when the statutory framework governing the conduct in question and the antitrust complaint are "clearly incompatible."

The Supreme Court in *Credit Suisse* was asked to decide whether the securities law governing the conduct at issue in that case impliedly precluded the application of the antitrust laws. To decide this issue, the Supreme Court found it necessary to determine whether sufficient incompatibility existed between the securities law and the antitrust complaint, to warrant an implication of preclusion, and identified several critical factors that should be considered, in light of the context and likely consequences: "(1) the existence of regulatory authority under the securities law to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority; and (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct." 551 U.S. at 275-76. In addition, the Supreme Court noted a fourth factor—whether "the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law seeks to regulate." *Id.* at 276. The Bureau Defendants urge this Court to apply the factors enunciated in *Credit Suisse* to the case at bar, and submit that when the Court does so, all four factors weigh in favor of preclusion. Accordingly, the Bureau Defendants ask this Court to hold that they may not be sued under the antitrust laws for their conduct at issue here and dismiss the Complaint against them.

In response, Plaintiff disputes that the FCRA impliedly precludes application of the

67

antitrust laws. In support, she initially argues that no conflict exists between the FCRA and the antitrust laws, as they are definitely not repugnant to each other. Pl.'s Mem. in Opp'n to Lender Defs. at 22, ECF No. 63.[38] Plaintiff submits the FCRA and Sherman Act are not in conflict because they each promote different policy goals—the FCRA promotes fair use of credit information, while the Sherman Act promotes competition. Thus, Plaintiff maintains, there is simply no need to choose one meritorious policy over another where both policies promote unrelated and mutually beneficial goals. Second, Plaintiff argues that the remedies found in the FCRA and Sherman Act are different, as recovery of actual damages under the FCRA requires proof of fraud while the remedies under the Sherman Act for monopolistic pricing do not. Thus, Plaintiff submits it is entirely possible and probable a plaintiff could incur both forms of damages simultaneously but not be fully compensated if only a single statutory remedy is applied. Lastly, Plaintiff argues that the FCRA does not authorize or recommend, either expressly or impliedly, the sharing of pricing information. Congress was aware of the antitrust laws when it drafted the FCRA, and could have included a provision granting antitrust immunity, like it did for the exchange of loss information by insurance companies in the McCarren-Ferguson Act,[39] yet Congress failed to include such a provision in the FCRA. Therefore,

---

[38] Plaintiff incorporates her argument on this issue advanced in her brief in opposition to the Lender Defendants' motion to dismiss. The Court notes that the Lender Defendants merely cited *Credit Suisse* for the proposition that allowing Plaintiff to predicate her antitrust conspiracy claim on factual allegations that Defendants did precisely what Congress has authorized them to do would be plainly repugnant to the language and purpose of the FCRA, and thus, did not advance the argument that the FCRA impliedly precluded application of antitrust laws to this case. *See* discussion *supra* at 45 (citing Lender' Mem. at 14-15, ECF No. 34). Nonetheless, Plaintiff presented an argument opposing application of an implied antitrust exemption in her memorandum in opposition to the Lender Defendants' motion to dismiss at 21-23 (ECF No. 63), which she incorporates by reference in her memorandum in opposition to the Bureau Defendants' motion to dismiss.

[39] 15 U.S.C. §§1011-1015.

Plaintiff maintains, "it would be a tortuous analysis . . . to presume that in passing the FCRA, Congress implicitly intended a sweeping antitrust exemption allowing price fixing, but somehow failed to mention it."  Pl.'s Mem. in Opp'n to Lender Defs. at 23, ECF No. 63.  Moreover, Plaintiff submits there is no real conflict here because sharing of pricing information is governed by antitrust law, while sharing of credit history information is governed by the FCRA.  Plaintiff contends, therefore, it is unnecessary to undertake an implied preclusion analysis.

In reply, the Bureau Defendants counter that Plaintiff's arguments must fail because the proper inquiry is not whether the statutes promote different and conflicting policy goals generally, but rather, whether there is a clear repugnancy between applying antitrust laws *to the conduct alleged* and the FCRA.  Bureau Defs.' Reply Mem. at 5, ECF No. 68.  As stated in their opening memorandum, the Bureau Defendants argue the FCRA precludes antitrust liability for conduct by the Bureaus that is sanctioned by the Act.

The Court agrees with Plaintiff that it is unnecessary to undertake an implied preclusion analysis in this case, but for a different reason.  Because this Court has already found that the Bureau Defendants' alleged conduct here is not unlawful under the antitrust laws, it does not need to, nor should it, reach this issue.  *Credit Suisse,* 551 U.S. at 287 (Stevens, J., concurring) (opining that he "would hold, as [the Supreme Court] did in *Parker v. Brown,* 317 U.S. 341, 351-52 (1943), that the defendants' alleged conduct does not violate the antitrust laws, rather than holding that Congress has implicitly granted them immunity from those laws.").

### 4.      Leave to Amend the Complaint

In the alternative, Plaintiff has summarily requested leave to amend her Complaint.  Pl.'s Mem. in Opp'n to Bureau Defs. at 13, ECF No. 60.  The Court recommends that Plaintiff's request for leave to amend her complaint be denied for the same reasons set forth with regard to

the motion to dismiss filed by the Lender Defendants.  *See* discussion *supra* at 51-53.   In addition, leave to amend the Complaint against the Bureau Defendants would be futile because her conspiracy theory as to them is simply implausible, and she has failed to proffer to this Court, either in her written briefs or at oral argument, any additional facts to show that the Bureau Defendants engaged in unlawful conduct under §1 of the Sherman Act.  Accordingly, the Court recommends that Plaintiff's Complaint against the Bureau Defendants be dismissed with prejudice.

### E.      FICO's Motion to Dismiss

Defendant Fair Isaac Corporation ("FICO") has also moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) (ECF No. 36).   In support of its motion to dismiss, FICO joins in, and incorporates by reference, the motion to dismiss and the memorandum of law in support thereof filed by the Lender Defendants, as well as Part I.A. of the memorandum of law in support of the Bureau Defendants' motion to dismiss.  In addition, FICO submits that the Complaint is devoid of any factual allegations that would support the conclusion that FICO conspired in violation of §1 of the Sherman Act.   Moreover, FICO maintains the Complaint is so vague and conclusory that it fails to state a claim against any Defendant, much less FICO.   In this regard, FICO points out that significantly, the Complaint fails to allege that FICO either originates or services consumer loans, is a bank or lender, or that it sets interest rates or credit terms for loans.  Mem. of Law in Supp. of FICO's Mot. to Dismiss ("FICO's Mem.") at 3, ECF No. 38.  In addition, FICO notes that the Complaint does not contain any allegations that (1) FICO entered into any sort of agreement with any other Defendant other than to "share private data, or (2) that there were communications between FICO and any Defendant, except for

allegedly sharing data and "providing a [credit] 'score' to lenders." *Id.* The most that can be gleaned from these allegations, according to FICO, is that FICO assists lenders by creating a credit score. *Id.* FICO further submits that the Complaint fails to set forth any facts suggesting that it engaged in anything other than lawful, independent conduct. Thus, FICO maintains, that Plaintiff cannot possibly state a plausible claim for relief under §1 of the Sherman Act against it, and asks that the Complaint against it be dismissed with prejudice.

In response, Plaintiff incorporates her previous arguments as set forth in opposition to the motions to dismiss of the Lender Defendants and Bureau Defendants. She also advances several arguments specific to FICO, none of which has any merit. Initially, perceiving FICO to be arguing that because it does not sell or service loans it is immune from antitrust allegations, Plaintiff argues that the courts have never recognized a defense to antitrust based on whether a conspirator sold the object of the price fixing scheme. Contrary to Plaintiff's perception, the Court does not perceive FICO to be advancing any such argument. Nor does the Court perceive that FICO is attempting to draw a distinction between companies or organizations that sell products or own facilities, and those that provide only services. FICO merely states in its supporting memorandum that Plaintiff "does not (and cannot) allege that FICO makes loans." (FICO Mem. at 2, ECF No. 38.) Also, Plaintiff relies on two Supreme Court cases[40] in support of her argument that any form of organization, even non-profits that sell nothing whatsoever, can violate the Sherman Act so long as there is cooperation in the price fixing scheme. Pl.'s Mem. in

---

[40] *Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85 (1984) (finding NCAA's plan for televising college football games of its member institutions for 1981-85 seasons constituted horizontal price fixing in violation of §1); *United States v. Topco Assocs., Inc.,* 405 U.S. 596 (1972) (finding association's scheme of allocating territories to minimize competition at retail level was horizontal restraint constituting per se violation of §1).

Opp'n to FICO at 5, ECF No. 62. However, Plaintiff's reliance on the cited Supreme Court cases is misplaced, as neither case addresses the proposition for which it is cited—whether an organization that neither sells nor owns products is liable for violation of §1. In any event, here the Complaint fails to allege any facts to suggest any cooperation or agreement between FICO and the other Defendants to fix interest rates or the terms of loans. Indeed, a review of the Complaint reveals few allegations specifically directed at FICO, which consist of the following:

> FICO and VantageScore are credit scoring companies that provide a "score" to lenders which is used to price consumer loans. Together, FICO and VantageScore provide over 85% of the credit scores to lenders in the United States. (Compl., ¶21.)

> The credit scoring industry is dominated by two companies, FICO and VantageScore. (Compl., ¶ 65.)

> In order to consolidate and distribute the vast amount of consumer data, an oligopoly of three credit bureaus and two credit scoring companies have emerged as the most efficient method for highly centralized, rapid distribution of competitively sensitive data among competitors. (Compl., ¶ 29.)

> Furthering the conspiracy, credit scoring companies use the reported information from credit bureaus to create a derivative score which incorporates all of the consumer's credit data as well as the consumer's profitability. The score is then distributed to all lenders. The lending industry has identified that the most profitable customers are the ones having the lower credit scores. Consequently, by examining credit scores, lenders can rapidly identify the most profitable customers and fix rates accordingly. Thus, credit scoring companies assist lenders in effecting a parallel pricing scheme for credit by creating a derivative metric which is an effective proxy for setting uniform price points among competitors. (Compl., ¶ 36.)

> Defendants also continue to use credit reporting agencies and credit scoring agencies to restrain and control the price of consumer loans. (Compl., ¶71.)

When the Court weeds out the conclusory allegations from the above paragraphs, the remaining allegations of fact suggest that FICO's involvement in the alleged conspiracy consists of (1) providing a "score" to lenders (¶21); (2) distributing competitively sensitive data among competitors (¶29); (3) using information from credit bureaus to create a derivative score (¶36); and assisting lenders by creating a derivative metric (¶36). The Court finds that this alleged involvement by FICO does not support an inference that FICO conspired, agreed or cooperated with any other Defendant to engage in any unlawful acts, or even communicated with the other Defendants to form the basis of an agreement.

The next argument advanced by Plaintiff goes to whether her allegation in the Complaint to the effect that a credit score is really a pricing model, is factual, not conclusory. Plaintiff maintains that it is factual and therefore must be accepted as true. Pl.'s Mem. in Opp'n to FICO at 5, ECF No. 62. The Court previously addressed this point, finding Plaintiff's statement to be a legal conclusion, and, in any event, not borne out by Plaintiff's own supporting documents. *See* discussion *supra* at 43-44. Also unavailing is Plaintiff's attempt to buttress this argument with FICO's "own admissions . . . in its trademark prosecution file wrapper," that "lenders can use 'it [the FICO® score] for credit line management, cross-selling, balance building, [and] pricing (emphasis added) …..'" Pl.'s Mem. in Opp'n to FICO at 5, ECF No. 62 (quoting Trademark Registration Ser. No. 76137347 File Wrapper, Specimen deposit, Aug. 28, 2008, attached as Ex. C). First of all, the referenced document is not found anywhere in the record.[41] Second, the quoted excerpt does not support Plaintiff's conclusion—that FICO's own literature confirms the truth of Plaintiff's allegation that FICO assists lenders in fixing prices. This point was raised in

---

[41] However, Plaintiff appears to be quoting from FICO's website. *See* Ex. C to Pl.'s Mem. in Opp'n to FICO, ECF No. 62-2.

opposition to the Lender Defendants' motion to dismiss, and the Court rejects it for the same reasons it rejected it vis a vis the Lender Defendants. Moreover, in light of the Court's conclusion that the statements on FICO's website do not suggest that FICO assists lenders in fixing prices, Plaintiff's argument that the statements on FICO's website constitute direct evidence of a meeting of the minds, or operate as a "plus" factor, is likewise unavailing.

Finally, the Court finds that the factual allegations directed toward FICO do not suggest that its conduct was unlawful. There are no facts alleged to suggest FICO engaged in any acts other than providing credit scores to credit bureaus and lenders. Nor are there any facts alleged to suggest an agreement between Defendants to use the credit scores to fix interest rates or credit terms. Inasmuch as this Court has already found the credit scores are not pricing models, FICO's conduct is not unlawful.[42]

Thus, for these and the reasons set forth above with regard to the Lender Defendants' and Bureau Defendants' motions to dismiss, the Court finds Plaintiff has failed to state a plausible §1 claim against FICO. Therefore, the Court recommends that the Complaint as to FICO be dismissed with prejudice.[43]

## F.  **VantageScore's Motion to Dismiss**

VantageScore has filed a Motion to Dismiss the Complaint Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 39). Essentially, VantageScore argues that this Court does not possess personal jurisdiction over it. VantageScore further argues

---

[42] The remainder of Plaintiff's arguments in opposition to FICO's motion to dismiss dovetail those raised in opposition to the Lender Defendants' motion to dismiss, and fail for the reasons stated above.

[43] Plaintiff's request for leave to amend her complaint as to Defendant FICO (Pl's Mem. in Opp'n to FICO Mot. to Dismiss at 8, ECF No. 62), should be denied for the same reasons set forth with regard to the Lender Defendants' and Bureau Defendants' motions to dismiss. *See* discussion *supra* at 51-53, 70.

that the Complaint should be dismissed for failure to plead a cognizable §1 claim against it. The Court will address each of these arguments in turn.

### 1.    Motion to Dismiss for Lack of Personal Jurisdiction

As a preliminary matter, VantageScore has moved to dismiss Plaintiff's Complaint with prejudice on the basis that this Court lacks personal jurisdiction over it under Rule 12(b)(2).

### a.    Standard of Review – Rule 12(b)(2) Motion

In ruling on a motion to dismiss under Rule 12(b)(2), the court is required, as with Rule 12(b)(6) motions, to accept as true all allegations contained in the complaint and view all factual disputes in plaintiff's favor. *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citing *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir. 2004)). Unlike a Rule 12(b)(6) motion, however, the scope of the Court's review on a Rule 12(b)(2) motion is not limited to the face of the complaint, but may include affidavits or other competent evidence submitted by the parties. *Patterson v. FBI,* 893 F.2d 595, 603-04 (3d Cir. 1990) (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir. 1984)).

Ultimately, the plaintiff bears the burden of proving, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction over the defendants. *Metcalfe v. Renaissance Marine, Inc.,* 566 F.3d 324, 330 (3d Cir. 2009) (citing *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368 (3d Cir. 2002)). If an evidentiary hearing is not held on the 12(b)(2) motion, then the plaintiff need only demonstrate a prima facie case of personal jurisdiction at the preliminary stages of litigation.[44] *Metcalfe*, 566 F.3d at 330 (citing *O'Connor v. Sandy Lane Hotel Co.*, 496

---

[44] "However, the plaintiff's allegations must be grounded in 'specific facts.'" *Decon Labs., Inc. v. Decon Labs. Ltd.,* 703 F.Supp. 2d 481, 485 (E.D.Pa. 2009) (citing *Marten v. Godwin,* 499 F.3d 290, 298 (3d Cir. 2007)).

F.3d 312, 316 (3d Cir. 2007)); *D'Jamoos*, 566 F.3d at 102 (citing *Miller Yacht Sales,* 384 F.3d at 97).   Once a defendant submits contradictory evidence through an affidavit, plaintiff may not rest on the allegations in the complaint, but must come forward with affidavits or other competent evidence to show that personal jurisdiction is proper.  *In re Chocolate Confectionary Antitrust Litig.,* 602 F.Supp. 2d 538, 556 (M.D.Pa. 2009) (citing *Patterson,* 893 F.2d at 603-04) (footnote & other citation omitted); *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir. 1996) (citations omitted); *Time Share Vacation Club,* 735 F.2d at 66 n. 9 (citation omitted).  To satisfy this burden, the plaintiff "may not rely on bare pleadings, but must produce competent evidence to establish 'with reasonable particularity' the nature and extent of the defendant's contacts with the forum state."  *Burke v. Quartey,* 969 F.Supp. 921, 924 (D.N.J. 1997) (citing *Patterson*, 893 F.2d at 603–04); *see also  Sprague Energy Corp. v. Union Drawn Steel II, Ltd.,* Civ. A. No. 07-962, 2008 WL 696911, *2 (W.D.Pa. Mar. 12, 2008) ("because a 12(b)(2) motion requires resolution of factual issues outside the pleadings, the plaintiff may not rely on the pleadings alone to carry its burden of establishing the jurisdictional facts.").  Once the plaintiff has sustained this burden, the 12(b)(2) motion will be denied despite any controverting presentation by defendant.  *Chocolate Confectionary,* 602 F.Supp. 2d at 557 (citing *Cateret Sav. Bank, F.A. v. Shushan,* 954 F.2d 141, 142 n. 1 (3d Cir. 1992)); *Burke,* 969 F.Supp. at 924; *see also Metcalfe,* 566 F.3d at 331.

### b.  Sufficiency of Contacts with the Forum

In cases where the plaintiff's claim is predicated on a federal statute which authorizes nationwide service of process, such as the Sherman Act, *see* 15 U.S.C. §22,[45] courts apply a Fifth

---

[45] Section 12 of the Clayton Act, codified at 15 U.S.C. §22, provides:

Amendment due process analysis to personal jurisdiction challenges. *In re Auto. Refinishing Paint Antitrust Litig.,* 358 F.3d 288, 299 (3d Cir. 2004) (holding that "personal jurisdiction under Section 12 of the Clayton Act is as broad as the limits of due process under the Fifth Amendment") (citing *Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1415 (9th Cir. 1989)); *Pinker,* 292 F.3d at 368-69 (citation omitted) ("In federal court, the exercise of specific jurisdiction must satisfy the requirements of the Due Process Clause of the Fifth Amendment."); *Chocolate Confectionary,* 602 F.Supp. 2d at 557 ("When a statute such as the Sherman Act permits nationwide service of process, the Fifth Amendment Due Process Clause guides the court's personal jurisdiction inquiry.") (citing *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 295 (3d Cir. 1985)) (other citation and footnote omitted); 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §1068.1 at 594 (3d ed. 2002) ("it is now clear that the Due Process Clause of the Fifth, rather than the Fourteenth, Amendment applies to the assertion of personal jurisdiction in the federal question context.") (citing *Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97 (1987)).

In *Go-Video*, the court of appeals explained the requirements of the due process component of the Fifth Amendment: "a court must consider whether the maintenance of the suit (i.e. the exercise of personal jurisdiction over the defendants to the suit) offends traditional notions of fair play and substantial justice." 885 F.2d at 1415 (citing *Omni Capital Int'l,* 484

---

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; *and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.*

(Emphasis added.) The nationwide service of process provision in Section 12 of the Clayton Act applies to cases brought pursuant to Section 1 of the Sherman Act. *See* 15 U.S.C. §12 and Historical & Stat. Notes thereto (defining antitrust laws to include sections 1 through 7 of Title 15, known as the Sherman Act).

U.S. at 102-03; *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). In assessing whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice," the inquiry in the federal court context takes "less account of federalism concerns and focus[es] more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Pinker,* 292 F.3d at 370 (internal citations omitted). Thus, "specific [personal] jurisdiction may be exercised only when the defendant has constitutionally sufficient 'minimum contacts' with the forum, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe,* 326 U.S. at 316), and where subjecting the defendant to the court's jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Pinker,* 292 F.3d at 369 (quoting *Int'l Shoe,* 326 U.S. at 316).

Moreover, when the parties challenging personal jurisdiction are alien corporations, the court of appeals for this circuit has held that the relevant forum for analyzing the extent of an alien corporation's contacts is the United States as a whole. *Pinker,* 292 F.3d at 369; *Auto. Refinishing,* 358 F.3d at 298. Thus, "a federal court's personal jurisdiction may be assessed on the basis of the [alien] defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process." *Pinker,* 292 F.3d at 369 (citations omitted). However, the United States Court of Appeals for the Third Circuit has not had an opportunity to address the question of whether a national contacts test should be applied to domestic corporations in an antitrust case, and the other courts of appeals and district courts faced with this issue are in disagreement.[46] Because neither party has advanced any argument for applying

---

[46] *Compare Action Embroidery Corp. v. Atl. Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir. 2004) (applying national contacts test to domestic corporation's contacts in antitrust case & finding defendant's status as a Virginia professional corporation and operating in U.S. constituted sufficient minimum contacts with U.S. to subject it to personal jurisdiction in California); *Daniel v. Am. Bd. of Emergency*

a national contacts test here, this Court will refrain from doing so, and thus, will analyze the sufficiency of VantageScore's contacts with Pennsylvania under that state's long-arm statute, and the constitutional due process requirements of the Fifth Amendment.

Under Pennsylvania's long-arm statute, codified at 42 Pa.Cons. Stat. Ann. § 5322 (West 2004), Pennsylvania courts are authorized to exercise personal jurisdiction over a person who, directly or through an agent, as to a cause of action arising from such person, engages in certain forum related activities. 42 Pa. Cons. Stat. Ann. §5322(a). Personal jurisdiction predicated on §5322(a) falls within the category of personal jurisdiction known as specific jurisdiction, which "arises when a defendant has both purposefully directed its activities at residents of the forum state and the action arises from, or is directly related to, the defendant's actions within the forum state." *Dentsply Int'l,* 516 F.Supp. 2d at 338 (citing *Burger King,* 471 U.S. at 472); *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 451 (3d Cir. 2003) (quoting *Pinker,* 292 F.3d at 368).

In addition, the Pennsylvania long-arm statute authorizes the exercise of such personal jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with [Pennsylvania] allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. §5322(b). Thus, to satisfy due process, the defendant

---

*Med.,* 988 F.Supp. 127, 143-44 (W.D.N.Y. 1997) (worldwide service of process provision of §12 could be used with domestic corporation via 28 U.S.C. §1391(b) & (c)); *Icon Indus. Controls Corp. v. Cimetrix, Inc.,* 921 F.Supp. 375, 376 (W.D.La. 1996) (finding personal jurisdiction existed over domestic corporation based on worldwide service of process provision in §12 of Clayton Act); *with GTE New Media Serv., Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1351 (D.C. Cir. 2000) (holding worldwide service of process clause in §12 of Clayton Act may only be invoked to establish personal jurisdiction over corporate defendant when venue requirements in §12's first clause have been met) (citing *Goldlawr, Inc. v. Heiman,* 288 F.2d 579, 581 (2d Cir. 1961), *rev'd on other grounds* 369 U.S. 463 (1962)); *Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.,* 516 F.Supp. 2d 324, 337-38 (D.Del. 2007) (declining to apply national contacts test to domestic corporations in antitrust case), *aff'd on other grounds,* 602 F.3d 237 (3d Cir. 2010); *Cumberland Truck Equip. Co. v. Detroit Diesel Corp.,* 401 F.Supp. 2d 415, 424 (E.D.Pa. 2005) (holding that where defendants are domestic corporations asserting personal jurisdiction solely under the nationwide service of process clause in §12, venue must also be established pursuant to §12).

must have certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe,* 326 U.S. at 316 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)) (other citations omitted). The minimum contacts requirement serves the purpose of "protect[ing] the defendant against the burdens of litigating in a distant and inconvenient forum" by requiring that the "defendant's conduct and connection with the forum State [be] such that [a defendant] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92, 297 (1980) (citations omitted). This framework enables "potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* at 297. Moreover, a plaintiff cannot unilaterally create the necessary contacts between the defendant and the forum; rather, "minimum contacts" can arise only by "'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King,* 471 U.S. at 475 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).

The other category of personal jurisdiction under which a plaintiff may establish a court's jurisdiction over a defendant is general jurisdiction. A court's general jurisdiction may be invoked where the non-resident defendant's contacts with the forum are "continuous and substantial" but are not related to the plaintiff's cause of action. *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 200 (3d Cir. 1998) (citation omitted). To establish personal jurisdiction over a corporation under Pennsylvania's general jurisdiction statute, a plaintiff must demonstrate that the corporate defendant either: (1) is incorporated under or qualifies as a foreign corporation under Pennsylvania law; (2) consents to jurisdiction; or (3) carries on "a continuous and systematic part of its general business" within Pennsylvania. 42 Pa. Cons. Stat.

Ann. §5301(a)(2). As neither the first nor second bases are present in this case, general jurisdiction can only be obtained under the third basis.

The court of appeals for this circuit has held that a plaintiff must prove significantly more than mere minimum contacts to invoke a court's general jurisdiction. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir. 1987) (citations omitted). Thus, to satisfy due process, the contacts of a nonresident defendant with the form must be continuous and substantial. *Id.* (citations omitted). For example, continuous and substantial contacts were found to exist where the evidence of record showed that defendants transacted business in the forum "[b]y maintaining an office and an agent in [the forum] on an ongoing basis, entering into contractual relationships in [the forum], and designating and maintaining billing and technical contacts within [the forum]," thereby subjecting the non-resident defendants to the general jurisdiction of the forum district. *Twentieth Century Fox Film Corp. v. iCraveTV,* Nos. Civ.A. 00-121 and 00-120, 2000 WL 255989, * 4 (W.D.Pa. Feb.8, 2000) (citations omitted). With these precepts in mind, the Court will examine the sufficiency of VantageScore's contacts with Pennsylvania.

In the case at bar, VantageScore has submitted the Declaration of Michael J. Dunn, Vice President Strategic Planning & Communications of VantageScore ("Dunn Decl.") (Ex. A to VantageScore's Motion to Dismiss at ¶1, ECF No. 39-1), which shows that VantageScore was formed as a Delaware limited liability company in February 2006, with its principal and only place of business in Stamford, Connecticut. (Dunn Decl., ¶2.) According to Dunn, "VantageScore was formed for the purposes of owning the intellectual property rights to a credit scoring algorithm; licensing its algorithm solely to Equifax …, Experian …, and Trans Union …; educating government regulators and lenders about the algorithm; and maintaining the algorithm

by performing periodic validations." (Dunn Decl., ¶3.)

With respect to VantageScore's contacts with the forum state, Dunn attests that VantageScore does not have any customers or clients in Pennsylvania; does not furnish credit of any type to any person or entity in Pennsylvania; does not maintain credit data, receive credit data or process credit data for purposes of providing any individual consumer or entity with a credit report or credit score in Pennsylvania; does not produce or sell credit scores or credit reports to any person or entity in Pennsylvania; does not provide credit information to any credit reporting agency in Pennsylvania; nor does it produce credit scores to be used by any person or entity in Pennsylvania.[47] (Dunn Decl., ¶4.) Dunn further attests that VantageScore has never transacted business in Pennsylvania; has not entered into contracts with companies to supply products or services in Pennsylvania; is not licensed or registered to do business in Pennsylvania; does not have a registered agent for service in Pennsylvania; does not direct its business operations to any entities or individuals in Pennsylvania; does not own any real or personal property in Pennsylvania; and does not maintain bank accounts, telephone numbers or addresses in Pennsylvania. (Dunn Decl., ¶5.) According to Dunn, VantageScore's only contact with Pennsylvania occurs once a year during a week-long educational seminar offered by the American Banking Association for banking executives in Philadelphia, Pennsylvania. VantageScore has sponsored a social event at this seminar for the attendees for the last four years. (Dunn Decl., ¶6.) Based on this evidence, VantageScore submits that its contacts with Pennsylvania are insufficient for this Court to exercise either specific or general *in personam* jurisdiction over it.

---

[47] Dunn also attests that VantageScore does not otherwise engage in any of these activities. Dunn Decl., ¶4.

The Court finds that VantageScore has presented competent evidence to establish that this Court lacks personal jurisdiction over it. Therefore, Plaintiff has the burden of presenting competent evidence of her own to establish a prima facie case of personal jurisdiction. For the reasons that follow, the Court finds that Plaintiff has failed to meet her burden.

Plaintiff argues that all of the "evidence" she was able to obtain show that VantageScore is engaged in business with Pennsylvania residents. (Pl.'s Mem. in Opp'n at 4, ECF No. 64.) This "evidence" consists of her Complaint and excerpts from various public records and websites, but does not include any affidavit(s). Plaintiff's primary focus appears to be on VantageScore's alleged continuous and systematic contacts with Pennsylvania, to support the exercise of this Court's general personal jurisdiction over VantageScore. The Court will examine below each of the documents Plaintiff proffers as "evidence" of such contact.

Plaintiff first refers the Court to allegations in paragraphs 11 and 36 of her Complaint. As noted above, however, Plaintiff may not rely on her Complaint once VantageScore has come forward with an affidavit supporting its argument that this Court lacks personal jurisdiction over it. *Chocolate Confectionary,* 602 F.Supp. 2d at 556 (citing *Patterson,* 893 F.2d at 603-04); *Dayhoff,* 86 F.3d at 1302; *Time Share Vacation Club,* 735 F.2d at 66 n. 9. Moreover, looking at the substance of Plaintiff's allegations vis a vis VantageScore's contacts with the forum, paragraph 11 of the Complaint states that VantageScore is a Delaware LLC with its principal place of business in Stamford, Connecticut, and alleges in conclusory fashion that VantageScore does business within the Western District of Pennsylvania and elsewhere in the United States. Similarly, paragraph 36 of the Complaint contains only conclusory statements regarding credit scoring companies in general without any mention of specific acts directed toward the forum by VantageScore. Thus, even if Plaintiff could rely on the allegations in the Complaint, they

establish only that VantageScore is a non-resident of Pennsylvania, and thus, otherwise lack the specificity required to establish a prima facie case of personal jurisdiction over VantageScore in Pennsylvania. *Decon Labs.,* 703 F.Supp. 2d at 485.

In further support of her general jurisdiction argument, Plaintiff offers VantageScore's submission to the United States Patent and Trademark Office ("USPTO") for registration of its trademark, VantageScore® (Ex. D attached to Pl.'s Mem. in Opp'n to VantageScore's Mot. to Dismiss, ECF No. 64-4), as evidence that VantageScore engages in interstate commerce. That, combined with an excerpt from *Experian's* website inviting the customer to purchase his or her credit score, indicating that the product is a VantageScore® (Ex. E attached to Pl.'s Mem. in Opp'n to VantageScore's Mot. to Dismiss, ECF No. 64-5), is, according to Plaintiff, irreconcilable with VantageScore's argument that it sells nothing, has no clients or customers, and derives no significant revenue from Pennsylvanians, who order its product, including Plaintiff. Plaintiff's argument is unavailing for several reasons.

First, mere ownership of a registered U.S. trademark does not subject a domestic company to personal jurisdiction in every state throughout the United States. *Love v. The Mail on Sunday*, No. CV05-7798 ABCPJWX, 2006 WL 4046170, at *7 (C.D. Cal. July 14, 2006); *Gen. Motors Corp. v. Ignacio Lopez De Arriortua,* 948 F.Supp. 656, 666 n. 9 (E.D. Mich. 1996). To so hold would run afoul of "the mandate of the Due Process Clause or the limits on judicial authority that the Clause ensures." *J. McIntyre Mach. Co. v. Nicastro*, ___ U.S. ___, 131 S.Ct. 2780, 2789-2791 (2011) (plurality op.) (holding "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis. . . . Due process protects [an individual's] right to be subject only to lawful authority[,]" and the "authority to subject a defendant to judgment depends on purposeful availment," *i.e.,* an action of the defendant purposefully directed toward the forum

state.)  Thus, an approach which does not conduct a forum-by-forum analysis, but relies merely on ownership of a registered U.S. trademark as evidence of interstate commerce, violates the Due Process Clause.

Second, Plaintiff relies upon Exhibit E, which states "Get Your VantageScore For Only $7.95" (Ex. E, ECF No. 64-5), in support of her position that VantageScore derives revenue from Pennsylvanians purchasing the VantageScore® product through Experian, a co-owner of VantageScore Solutions, LLC.  However, Plaintiff appears to ignore the fact that Exhibit E is actually a page from *Experian's* website, not VantageScore's, an important distinction.  At most, Exhibit E demonstrates that consumers may purchase their credit scores from Experian, one of three credit reporting companies. Exhibit E does not establish that VantageScore made sales to or otherwise had contact with Pennsylvanians.  In fact, Dunn's Declaration makes clear that VantageScore is not selling credit scores to *any* consumers or entities, let alone those residing in Pennsylvania.  (Dunn Decl. ¶ 4.)  Moreover, mere ownership of a subsidiary company, without more, is not sufficient to show that the subsidiary's revenues from the sale of the its product flow directly to the parent company.  *See* discussion *supra* at 57-59.  Plaintiff fails to cite any facts or legal authority that would justify leaping to such a conclusion.

The last infirmity with Plaintiff's argument regarding the trademark registration documents (Exhibits D and G) is that she concludes, without evidentiary support, that Pennsylvanians, including her, order VantageScore's product.  She also presumes, incorrectly, that VantageScore actually sells a "product" to consumers.  The record is completely devoid of any evidence showing that Pennsylvanians and/or Plaintiff purchased any VantageScore "product."  Nowhere in either of the trademark documents proffered by Plaintiff (Exhibits D and G) is there any indication that VantageScore is offering to sell its credit scoring model/

algorithm, let alone credit scores, to lenders or consumers.    A close review of Plaintiff's Exhibit D reveals only that VantageScore is a Delaware LLC, with a registered office in Stamford, Connecticut, and that the goods and services provided consist of "[f]inancial services in the nature of credit modeling, namely, the evaluation of credit and other data as credit risk predictors, credit scoring services, and analytical services, namely, evaluation of credit and other data as credit risk predictors, all for purposes of evaluating credit worthiness." (Ex. D at 1, ECF No. 64-4.)  Plaintiff's Exhibit G provides similar information, and additionally, reveals that VantageScore used counsel from Atlanta, Georgia, for its trademark registration work, and includes a specimen consisting of web page advertisements from Trans Union and VantageScore containing the mark and a description of the services.  (Ex. G at 1-4, 7-12, ECF No. 64-7.)   At most, the web page advertisements indicate that the VantageScore® credit scoring model can be accessed through one of the three credit scoring companies—Trans Union, Experian, or Equifax (Ex. G at 11, ECF No. 64-7)—who are licensees of VantageScore's algorithm (Dunn Decl. ¶3). Indeed, Dunn's Declaration confirms that VantageScore was formed for the purposes of owning the intellectual property rights to a credit scoring algorithm and licensing said algorithm solely to Equifax, Experian and Trans Union.  (Dunn Decl. ¶3.)   Thus, Mr. Dunn's declaration stands uncontroverted on this point.

In further support of her general jurisdiction argument, Plaintiff refers the Court to Exhibit F (ECF No. 64-6), which she alleges is her VantageScore® ordered from her computer in Pennsylvania. (Pl.'s Mem. in Opp'n to VantageScore's Mot. to Dismiss at 5, ECF No. 64.) However, Exhibit F does not represent anything ordered by Plaintiff, but rather, is VantageScore's October 20, 2010 issue of its newsletter, *The Score*. In fact, *The Score* actually directs lenders and consumers interested in obtaining credit scores calculated using

VantageScore® to contact any of the credit reporting companies. (Ex. F at 2, ECF No. 64-6.)[48]

Next, Plaintiff appears to be arguing that because trademarks are used to identify the source of goods and services in the marketplace, it is reasonable to conclude that the source of the VantageScore®, routinely purchased by Pennsylvanians through its agents/licensees, is VantageScore Solutions, LLC, based solely on the appendage of the registered trademark symbol "®" to "VantageScore." Plaintiff's argument is flawed in several respects. First, Plaintiff's argument is based on presumptions that are not supported by competent evidence. For example, there is simply no evidence to show that Pennsylvanians, including Ms. Black, purchased a VantageScore® credit score from VantageScore or, for that matter, from any of its licensees, or that the credit reporting companies are agents of VantageScore.[49] Second, even if Plaintiff had presented evidence showing that she and/or other Pennsylvanians purchased VantageScore® credit scores from Experian, Equifax and/or Trans Union, that still would not establish that *VantageScore* sold credit scores or that it targeted Pennsylvania. The mere existence a license agreement between VantageScore and the credit reporting companies is not sufficient in and of itself to establish that VantageScore was directing its business activities to residents of the forum state. As Plaintiff herself concedes, regardless of what the license is used for (trademark intellectual property and/or patent intellectual property), "the outcome of the case would not change because it is the purposeful or expected sale of the product itself in the forum that confers jurisdiction, not the licensing arrangement." Pl.'s Mem. in Opp'n to VantageScore at 6, ECF

---

[48] The Court notes that Plaintiff filed a Sur-Reply Brief in Opposition to VantageScore's Motion to Dismiss (ECF No. 76) to which she could have attached documentation of the alleged purchase of her VantageScore® credit score from her home computer in Pennsylvania or an affidavit, yet she failed to attach any such evidence.

[49] *See* discussion *supra* at 60-61 rejecting Plaintiff's attempt to predicate the Bureau Defendants' liability on an alleged agency relationship with VantageScore.

No. 64 (citing *World-Wide Volkswagen,* 444 U.S. at 298). Here both Dunn's declaration and Plaintiff's "evidence" shows that there was no purposeful or expected sale by VantageScore of any of its products in the forum.

Also, contrary to Plaintiff's assertion, VantageScore's description of its goods and services on its trademark registration documents is not impossible to reconcile with Mr. Dunn's declaration that VantageScore does not have any customers or clients, produce or sell credit scores to any person or entity, or provide credit information to any credit reporting company. (Dunn Decl. ¶4.) Nothing in the description of its goods and services implies that VantageScore produces or sells credit scores to any person or entity. Plaintiff fails to offer any competent evidence to raise an issue of fact in this regard.

Having considered Plaintiff's "evidence" and concluding that none of it controverts any of the jurisdictional facts asserted in Dunn's declaration, this Court concludes that VantageScore has not engaged in continuous and substantial business activities which would allow this Court to properly exercise general jurisdiction over it. VantageScore is a non-resident company, does not transact any business in Pennsylvania, nor does it own property or maintain an agent for service of process in this forum. Thus, the Court finds that given the absence of business activities in the forum, VantageScore does not appear to derive any revenue from Pennsylvania. The Court further finds that VantageScore's presence in the forum one day a year for general educational purposes unrelated to the litigation does not provide the continuous and systematic contacts required to invoke this Court's general *in personam* jurisdiction. *See Regan v. Loewenstein,* 292 F. App'x 200, 205 (3d Cir. 2008) (defendants' alleged presence in forum during occasional concerts was clearly not a "continuous and systematic" contact). As Plaintiff has failed to come forward with competent evidence to show any continuous and substantial business activities in

Pennsylvania, she cannot establish a prima facie case of general *in personam* jurisdiction over VantageScore.

Perhaps realizing the weakness of her general jurisdiction "evidence" and arguments, Plaintiff also advances a stream of commerce theory to establish specific personal jurisdiction over VantageScore. Plaintiff's attempt, however, falls short of the mark. Initially, Plaintiff argues that personal jurisdiction is not precluded because VantageScore is merely a holding company for intellectual property. (Pl.'s Mem. in Opp'n to VantageScore at 6, ECF No. 64.) In support, Plaintiff quotes from the court of appeals' decision in *Nuance Communications, Inc. v. Abbyy Software House,* 626 F.3d 1222 (Fed. Cir. 2010), *cert. denied,* ___ S.Ct. ___, 2011 WL 500233 (Jun. 28, 2011), which held: "[a]lthough the foreign manufacturer had no license for doing business in the forum, no assets, employees, or agents for service of process in the forum, and no direct sales in the forum, this court found the exercise of jurisdiction proper because the manufacturer purposefully shipped products through an established distribution channel with the expectation that those products would be sold in the forum." *Nuance Commc'ns,* 626 F.3d at 1233-34 (citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564-67 (Fed. Cir. 1994)). Plaintiff then notes that the product in *Nuance* was covered by a patent license, as opposed to a trademark license, but nonetheless submits that "to the best of [her] knowledge, it appears that in addition to a trademark license, VantageScore Solutions also licenses U.S. Patent No. 7,801,812 entitled 'Methods and systems for characteristic leveling].'" Pl.'s Mem. in Opp'n to VantageScore at 6, ECF No. 64. Then Plaintiff attempts to argue that her case and *Nuance* are analogous because both cases involve patent licenses,[50] "plac[ing] the case law directly on

---

[50] VantageScore notes in its reply brief that technically it does not license its patent, but rather, it is the assignee of the patent. (VantageScore's Reply Br. at 3, ECF No. 69 & Ex. 1 at 2, ECF No. 69-1.)

point." *Id.* However, simply because the defendant in *Nuance* and VantageScore may have been patent-holders/assignees, that does not make the cases analogous, especially where, as in *Nuance,* the court's jurisdictional ruling did not turn on the manufacturer's status as a patent-holder.

In actuality, *Nuance* is factually distinguishable from the case at bar. In *Nuance,* evidence showed that the defendant foreign manufacturer actually sold its products to a distributor who in turn sold the manufacturer's products to residents of the forum state. Second, the record in *Nuance* contained additional facts establishing that the foreign company purposefully directed the sale of its allegedly infringing product, a software program, in California. For example, the agreement in *Nuance* was between two corporate defendants—commonly owned sister companies, one domestic California company and the other foreign, operating under a global management team—which expressed a desire by the foreign company to "win the whole U.S. market" by issuing its software program in the United States. Also, the foreign manufacturer admitted to distributing its software to its domestic sister company, a California entity. 626 F.3d at 1232. The record further showed that over 95% of the profits resulting from the sales of the software program flowed to the foreign manufacturer, and under its agreement with the California distributor, the foreign manufacturer retained ownership in the software even after it entered California. *Id.* at 1233. By contrast here, it is clear from Dunn's declaration that VantageScore is not selling a product (credit scores) to its licensees, Experian, Trans Union, and Equifax, for further distribution to consumers or lenders. Nor do the parties' submissions evidence any intent to target Pennsylvania on the part of VantageScore. Rather, the uncontroverted evidence shows that VantageScore licenses its algorithm exclusively to the three credit reporting companies for their use in calculating consumers' credit scores. Similarly, the

public documents submitted by Plaintiff do not show any desire or action on the part of VantageScore to distribute and/or sell its algorithm to consumers or lenders in the state of Pennsylvania. Moreover, because VantageScore does not sell any products to consumers or lenders in Pennsylvania, it cannot, and does not, derive any revenues from activities in this forum. Thus, the proposition for which Plaintiff cites *Nuance* is inapposite to this case.

Plaintiff next argues that based on *World-Wide Volkswagen,* 444 U.S. at 298, the licensing arrangement is not determinative of the outcome vis a vis personal jurisdiction, but rather, what does confer personal jurisdiction is the purposeful or expected sale of the product itself in the forum. Quoting *World-Wide Volkswagen,* Plaintiff argues "a defendant could purposefully avail itself of a forum by 'deliver[ing] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate.'" Pl.'s Mem. in Opp'n to VantageScore at 7 (quoting *World-Wide Volkswagen,* 444 U.S. at 298). To establish personal jurisdiction under this theory, Plaintiff attempts to show that VantageScore® "sold to Pennsylvanians does not end up in the forum by accident." Pl.'s Sur-Reply Br. at 3, ECF No. 76. She submits that because VantageScore owns both the trademark and patent to VantageScore®, VantageScore has absolute control over where VantageScore® ends up in the marketplace. Plaintiff maintains that VantageScore not only introduced VantageScore® into the marketplace, but continued to maintain control over its sale into Pennsylvania by dictating the license terms to retailers such as Experian as to where and to whom the product can be sold. *Id.* Plaintiff's argument is completely lacking an evidentiary foundation. None of the documents attached to Plaintiff's briefs provide any support for her argument. Indeed, none of her documents show that she or any Pennsylvanians purchased credit scores or any other product from VantageScore. On the other hand, Dunn's declaration establishes that VantageScore was formed for the purposes of

owning the intellectual property rights to a credit scoring algorithm, and licensing its algorithm exclusively to Experian, Trans Union, and Equifax, and that VantageScore does not produce or sell credit scores or credit reports to any person or credit reporting agency, in Pennsylvania or otherwise. (Dunn Decl. ¶¶3-4.) Even giving Plaintiff the benefit of the doubt, it simply cannot be logically inferred from the jurisdictional evidence that VantageScore maintained control over the sale of VantageScore® into Pennsylvania when all of the evidence shows that VantageScore did not sell or produce any products to consumers or lenders in any state.

The stream of commerce theory has been invoked frequently in products liability actions to permit jurisdiction over a non-resident defendant, acting outside the forum, which places a product in the stream of commerce, *i.e.,* traveled through an extensive chain of distribution before reaching the ultimate consumer, that ultimately causes harm inside the forum. *Goodyear Dunlop Tires Operations, S.A. v. Brown,* ___ U.S. ___, 131 S.Ct. 2846, 2855 (2011) (citing 18 W. Fletcher, *Cyclopedia of the Law of Corporations* §8640.40, p. 133 (rev. ed. 2007); Dayton, *Personal Jurisdiction and the Stream of Commerce*, 7 Rev. Litig. 239, 262-68 (1988)). The stream of commerce theory has also been applied in antitrust cases. Dayton, 7 Rev. Litig. at 261 & n. 73 (citing *Chrysler Corp. v. Gen. Motors Corp.,* 589 F. Supp. 1182 (D.D.C. 1984); *Hitt v. Nissan Motor Co.,* 399 F. Supp. 838 (S.D.Fla. 1975)). However, the Supreme Court has been unable to reach a consensus on whether the stream of commerce theory requires a showing of "something more" than the mere act of placing a product in the stream of commerce with the expectation it will be purchased in the forum state. *Asahi Metal Industry Co. v. Superior Court of Cal.,* 480 U.S. 102 (1987); *D'Jamoos,* 566 F.3d at 105 n. 15. Justice O'Connor, writing for a plurality of four justices in *Asahi*, concluded that something more was required—"*an action of the defendant purposefully directed toward the forum state*." 480 U.S. at 112 (emphasis in

original; citations omitted).[51]   In a separate opinion, Justice Brennan, joined by three other justices, concluded that the showing of something more was unnecessary.  480 U.S. at 117.[52] Recently, the Supreme Court attempted to clarify its position on the application of a stream of commerce theory, but unfortunately, only a plurality agreed with Justice O'Connor's "something more" approach, thus rejecting the conclusion reached by Justice Brennan, and leaving the lower courts without clear guidance once again.  *See J. McIntyre Mach.,* 131 S.Ct. at 2790.   The court of appeals for this circuit has yet to decide the issue as well.  *D'Jamoos,* 566 F.3d at 105 n. 15.

In any event, under either approach, this Court finds that Plaintiff has failed to establish a prima facie case of personal jurisdiction over VantageScore under a stream of commerce theory. Contrary to Plaintiff's argument at oral argument,[53] the court of appeals for this circuit has indicated that "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.'"  *Id.* at 105 (quoting *World-Wide Volkswagen,* 444

---

[51] Justice O'Connor explained her application of the stream of commerce theory as follows:

> The "substantial connection" between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.

*Asahi,* 480 U.S. at 112 (internal citations omitted).

[52] Justice Brennan opined that "jurisdiction premised on the placement of a product into the stream of commerce [without more] is consistent with the Due Process Clause[.]"  He went on to explain that "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise."  480 U.S. at 117 (opinion concurring in part and concurring in judgment).

[53] At oral argument on the motions to dismiss, Plaintiff argued that it was "absolutely foreseeable" that the VantageScore® was going to end up in Pennsylvania.  Tr. of Mots. Proceedings on 2/10/11 at 70, ECF No. 82.  To the extent her argument is based on a foreseeability test, Plaintiff ignores the court of appeals opinion in *D'Jamoos* finding that foreseeability alone is insufficient to establish personal jurisdiction under the Due Process Clause.

U.S. at 295).  The court of appeals further explained:

> [T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.  [*World-Wide Volkswagen,* 444 U.S.] at 297, 100 S.Ct. at 567.

*D'Jamoos,* 566 F.3d at 105.    Under this standard, the *D'Jamoos* court found that the stream of commerce theory did not apply to the facts of that case, as the product there did not follow the regular and anticipated path to Pennsylvania—i.e., "'the regular and anticipated flow of products from manufacture to distribution to retail sale.'"  *Id.* (quoting *Asahi,* 480 U.S. at 117 (Brennan, J. concurring)).[54]

Applying the relevant jurisprudence to the case at bar, this Court finds that the jurisdictional evidence shows that VantageScore's credit scoring algorithm did not follow the regular and anticipated flow of products from manufacture to distribution to retail sale.  Indeed, the evidence shows that VantageScore did not sell credit scores to consumers or lenders in Pennsylvania, nor did it sell or distribute credit scores to its licensees, Experian, Trans Union and/or Equifax, let alone distribute such credit scores with the expectation that they would be sold to consumers or lenders in Pennsylvania.  Moreover, it is arguable whether VantageScore's intellectual property, the credit scoring algorithm, is indeed a product.  *See Primesource Bldg. Prods., Inc. v. Phillips Screw Co.,* No. 3-07-CV-0303-M, 2008 WL 779906, at *4 (N.D. Tex. Mar. 25, 2008) (noting that the defendant did not  manufacture or sell any products but merely

---

[54] The court of appeals further noted that the stream of commerce theory provides no basis for exercising general jurisdiction over a non-resident defendant, but rather only applies to the exercise of specific jurisdiction.  *D'Jamoos,* 566 F.3d at 106 (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 788 (7th Cir. 2003); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 375 (5th Cir. 1987)).

designed proprietary fastener drive systems and licensed the technology to other companies who manufactured and sold fasteners incorporating defendant's design). As the district court observed in *Primesource,* "merely entering into a licensing agreement with a company that delivers products into the stream of commerce is insufficient to support the exercise of personal jurisdiction." *Id.* (citing *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1360 (Fed. Cir. 1998)).[55]  Similarly here, VantageScore's only "product" was its intellectual property—a credit scoring model/algorithm—which it licensed exclusively to the three credit reporting agencies, for their use in calculating consumers' credit scores.  The VantageScore® algorithm was not the final product that was being marketed by the credit reporting agencies for retail sale in Pennsylvania; rather, the credit reporting agencies were offering credit scores for sale, which were calculated by utilizing VantageScore's patented intellectual property.[56]  Under these circumstances, the Court cannot conclude that VantageScore could have reasonably anticipated being haled into court in Pennsylvania.  Thus, Plaintiff's argument that VantageScore® did not end up in Pennsylvania by accident is based entirely upon conjecture.

Moreover, the jurisdictional facts here stand in stark contrast to those in *Nuance,* where the court of appeals found that the forum state (California) had personal jurisdiction over the foreign manufacturer under the stream of commerce theory.  There, unlike the case at bar, the

---

[55] The district court in *Primesource* held that because the defendant did not manufacture or sell any products, but merely gave its  licensees the right to sue the patented technology to manufacture their own products under the defendant's and as owner of the product without the risk of being sued by defendant, such a covenant not to sue was not a product sold in the stream of commerce.  2008 WL 779906, at *5.

[56] At oral argument, Plaintiff's counsel likened the situation between VantageScore and the credit reporting companies to that of a manufacturer and distributor, and argued that VantageScore manufactured the score and as owner of the product and ultimately the license, they controlled where the product goes in commerce.  Tr. of Mots. Proceedings on 2/10/11 at 70, ECF No. 82.  Plaintiff's argument is without merit as the uncontroverted evidence shows that VantageScore is neither the manufacturer nor seller of the credit scores sold by the three credit reporting agencies.

court of appeals found the foreign manufacturer purposefully shipped the allegedly infringing software products into California through an established distribution channel (a California entity), with the expectation that copies of those products would be sold in California. *Id.* at 1234. In addition, under its agreement with the California distributor, the foreign manufacturer agreed to furnish the distributor with new versions and updates of its software, as well as technical support and oral and written consultations. *Id.* The *Nuance* court opined that this purposeful activity is the sort of activity the Supreme Court has endorsed as reinforcing the proper exercise of personal jurisdiction. *Id.* (citing *Asahi*, 480 U.S. at 112).

Accordingly, for the reasons articulated above, the Court finds that Plaintiff has failed to establish a prima facie case of personal jurisdiction over VantageScore.[57]

### c. Jurisdictional Discovery & Leave to Amend Complaint

In the alternative, Plaintiff requests leave of court to conduct jurisdictional discovery to determine which one of VantageScore's "mutually exclusive positions is true before briefing a rebuttal to the motion to dismiss." Plaintiff's request is premised on the notion that the Court must first determine whose product she purchased under the VantageScore® mark so that the entity can be served notice of the suit if, as VantageScore asserts, it derives no revenue from

---

[57] As further support for its argument that this Court lacks personal jurisdiction over it, VantageScore points to Judge Conti's ruling during a motion hearing in *Schweitzer v. Equifax Information Solutions LLC, Fair Isaac Corporation and VantageScore Solutions LLC,* docketed at Civil Action No. 2:08-cv-00478, in this district, where Judge Conti granted VantageScore's motion to dismiss for lack of personal jurisdiction. *See* Minute Entry dated 7/14/2008, W.D.Pa. Docket No. 2:08-cv-00478. However, without the benefit of an opinion detailing the reasons for Judge Conti's ruling, this Court declines to accord her ruling any weight in this case. And, in any event, this Court is not bound by the decision of another district court judge in an unrelated case. The complaint in *Schweitzer* asserted claims against all defendants under the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.,* and a state common law negligence claim. The Court notes that unlike the Sherman Act, the Fair Credit Reporting Act does not contain a statutory provision allowing nationwide service of process. *Korzeniowski v. NCO Financial Systems,* No. 3:09-cv-1399 (WWE), 2010 WL 466162, *2 (D. Conn. Feb. 8, 2010).

Pennsylvanians.  She also seeks leave to amend her Complaint to name the entity that derives revenue from the VantageScore® product which is sold to Pennsylvanians.  (Pl.'s Mem. in Opp'n to VantageScore at 7, ECF No. 64.)

VantageScore objects to Plaintiff's request for jurisdictional discovery, arguing that Plaintiff is in the best position to know where she obtained, if she did at all, her "VantageScore credit score."  VantageScore further submits that the three credit reporting companies (Experian, Trans Union, and Equifax) that sell VantageScore credit scores are already parties to this lawsuit. VantageScore submits, therefore, that Plaintiff's request should be denied.

The court of appeals for this circuit has held that a plaintiff's request for jurisdictional discovery should be granted "[i]f the plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state[.]'"  *Eurofins Pharma US Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 157 (3d Cir. 2010) (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992)).  "A plaintiff may not, however, undertake a fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery."  *Id.* (citing *Belden Techs., Inc. v. LS Corp.,* 626 F.Supp. 2d 448, 459 (D.Del. 2009).

As discussed above with respect to paragraphs 11 and 36 of her Complaint, Plaintiff has failed to present factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between VantageScore and Pennsylvania.  Further, none of Plaintiff's other evidence suggests such contacts.  Most importantly, Plaintiff failed to provide her own affidavit to counter VantageScore's evidence, or to provide documentation to support her statement that she purchased her VantageScore for $7.95.  Plaintiff alone is in the best position to know the details of her alleged purchase of her credit score.  Consequently, the Court

finds that Plaintiff has not made the requisite showing to suggest the possible existence of the requisite contacts between VantageScore and Pennsylvania. In this Court's opinion, allowing jurisdictional discovery on the bare allegations presented here would result in a fishing expedition. Accordingly, the Court recommends that Plaintiff's request for jurisdictional discovery be denied.

The Court also recommends that Plaintiff's request for leave to amend her Complaint to name the entity that derived revenue from the sale of VantageScore credit scores in Pennsylvania be denied. It is clear from the documents submitted that the only possible entities who could have derived revenues from the sale of credit scores, including those credit scores calculated using the VantageScore algorithm, are already named parties to this lawsuit. In addition, Plaintiff's request for leave to amend is mooted by the Court's recommendation that her request for jurisdictional discovery be denied.

Accordingly, the Court recommends that the Complaint against VantageScore be dismissed with prejudice for lack of personal jurisdiction.

## 2. Failure to State a Claim under Rule 12(b)(6)

Even if this Court had found that it could exercise personal jurisdiction over VantageScore, the Court would still recommend granting VantageScore's motion to dismiss on the basis that the Complaint fails to state a claim against VantageScore under Rule 12(b)(6).

Defendant VantageScore has also moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) (ECF No. 39). In support of its 12(b)(6) motion, VantageScore joins in, and incorporates by reference, the motions to dismiss and the memoranda of law in support thereof submitted by the Lender Defendants, as well as the implausibility argument advanced by the Credit Bureau Defendants in Section I.A. their motion memorandum of law. In

addition, VantageScore submits that dismissal of the Complaint is warranted because it is clear from the allegations in the Complaint that Plaintiff's lawsuit focuses on consumer lending. (VantageScore's Mem. of Law in Supp. of Mot. to Dismiss at 8, ECF No. 41 (citing Compl. ¶¶1, 18, 22-23, 25, 27, 43-50).)  VantageScore further contends that Plaintiff does not allege and cannot allege that it is a consumer lender, and indeed, the Complaint alleges VantageScore is one of two credit scoring companies.  (*Id.* (citing Compl. ¶21).)  Therefore, according to VantageScore, paragraphs addressed to Defendants generally that involve consumer lending, i.e. Compl. ¶¶43-45, 48-50, 52) do not apply to VantageScore.  (*Id.* at 9.)

VantageScore also submits that the few allegations directed specifically to VantageScore or to credit scoring companies do not state facts pertaining to wrongful conduct of VantageScore which, under §1 of the Sherman Act, requires the factual averments concerning an illegal agreement.  In particular, VantageScore submits neither paragraph 21 nor 29 alleges an illegal agreement.  Plaintiff's averment in paragraph 36 to the effect that credit scoring companies "use the reported information from credit bureaus to create a derivative score which incorporates all of the consumer's credit data as well as the consumer's profitability[,]" does not, according to VantageScore, allege illegal conduct.  And although paragraphs 40 and 71 discuss credit scoring, VantageScore submits that neither paragraph alleges an agreement between it and any other Defendant to fix the prices of consumer loans.  (*Id.*)

Finally, VantageScore argues that the Complaint fails to allege it engaged in any parallel conduct with the Lender Defendants to restrict borrowing, let alone facts to support an inference that an illegal agreement existed to which VantageScore was a party.  According to VantageScore, Plaintiff's Complaint "'furnishes no clue'" as to details involving when or where VantageScore's purported illegal agreement with the Lender Defendants occurred.  (*Id.* (citing

*Twombly,* 550 U.S. at 565 n. 10).)

In response, Plaintiff incorporates by reference the previous arguments and legal standards presented in her brief opposing the Lender Defendants' motion to dismiss. Plaintiff also advances several arguments specific to VantageScore, none of which has any merit. First, Plaintiff perceives VantageScore to be arguing that because it is not a lender, it is immune from antitrust liability and should be dismissed from this lawsuit, and responds that the courts have never recognized a defense to antitrust based on whether a conspirator sold the object of the price fixing scheme. In support, Plaintiff cites several cases for the proposition that an entity which does not sell any products can still be held liable for a §1 violation as long as there is cooperation in the price fixing scheme. (Pl.'s Mem. in Opp'n to VantageScore at 8-9, ECF No. 64.) Thus, Plaintiff maintains, the fact that VantageScore "sells nothing" is irrelevant in determining whether it is liable for engaging in price fixing. This argument is, in essence, the same argument advanced by Plaintiff in response to FICO's motion to dismiss. *See* Pl.'s Mem. in Opp'n to FICO at 5, ECF No. 62. The Court finds that Plaintiff's first argument fails for the same reasons as those stated above with regard to FICO's motion to dismiss. *See* discussion *supra* at 71-73.

Second, Plaintiff takes issue with VantageScore's argument that she failed to allege anything illegal in the Complaint sufficient to suggest an agreement. (Pl.'s Mem. in Opp'n to VantageScore at 9, ECF No. 64.) In support, Plaintiff relies on paragraphs 11 and 36 of the Complaint. However, paragraph 11 contains no factual allegations of an agreement, illegal or otherwise, and the factual allegations in paragraph 36, as explained above, suggest VantageScore's involvement in the alleged conspiracy consisted of using information from credit bureaus to create a derivative score, and assisting lenders by creating a derivative metric. The remaining allegations in paragraph 26 consist of unsupported conclusory allegations which are

not entitled to any presumption of truth. Plaintiff then claims she has discovered additional factual evidence from which a conspiracy can be inferred—a statement on VantageScore's website to the effect that "credit scores . . . are used by lenders not only to 'assess a borrower's loan eligibility' (i.e., creditworthiness, which is a potentially lawful use of the data) but also [sic] 'set loan/credit terms' (which in situations such as coordinating pricing is an unlawful use of data)." Pl.'s Mem. in Opp'n to VantageScore at 9, ECF No. 64. Based on this evidence, Plaintiff contends the Complaint properly pleads a factual basis for an illegal act by VantageScore. The Court considered this same argument raised by Plaintiff in response to the Lender Defendants' motion to dismiss, and rejected it. *See* discussion *supra* at 29-31. Therefore, the Court rejects Plaintiff's argument that the statement on VantageScore's website provides evidence from which a conspiracy can be inferred for the same reasons articulated above with regard to the Lender Defendants' motion to dismiss.

Next, Plaintiff submits that VantageScore "has also admitted that [it] provides a uniform model for competing lenders to adopt so that lenders can consistently fix loan terms." Pl.'s Mem. in Opp'n to VantageScore at 9, ECF No. 64. Plaintiff reaches this conclusion based on the following statement appearing in VantageScore's newsletter, *The Score*, dated October 20, 2010, and authored by VantageScore's president: "VantageScore is the generic credit scoring created by America's three major credit reporting companies. Our highly predictive model uses an innovative, patent-pending scoring methodology to provide lenders with a consistent interpretation of consumer credit files." (Ex. F attached to Pl.'s Mem. in Opp'n to VantageScore at 4, ECR No. 64-6.) Plaintiff argues that this "consistent interpretation" is intended to (and does) lead to consistent, uniform pricing in the lending industry as properly alleged in the Complaint (Compl. ¶¶11, 36), and as demonstrated factually in VantageScore's specimen

submitted to the USPTO in its Trademark/Service Mark Statement of Use (Ex. G attached to Pl.'s Mem. in Opp'n to VantageScore, ECF No. 64-7).  In particular, Plaintiff refers to page 11 of Exhibit G, which is entitled "VantageScore Fact Sheet" and focuses on the following excerpt:

> **Use of VantageScore assists lenders with decisions in a manual or automated environment:**
>
> - Set a cut-off score strategy to reduce the time to review an application manually.
> - Use the score for tiered offers with multiple cut-off strategies.  For example, extend the most favorable offer to the most creditworthy clients while extending appropriately adjusted offers to those consumers that are in the middle segment of credit risk and those consumers that are more risky.

Ex. G at 11 (attached to Pl.'s Mem. in Opp'n to VantageScore, ECF No. 64-7).

The Court finds that contrary to Plaintiff's assertion, this evidence does not demonstrate that VantageScore® is intended to be a consistent model for fixing the price of loans.  This Court considered a similar argument in response to the Lender Defendants' motion to dismiss and rejected it.  *See* discussion *supra* at 50.  Simply because VantageScore touts its credit scoring model as being "consistent" does not automatically suggest, in and of itself, that VantageScore has engaged in an agreement with lenders and/or credit reporting companies to fix the price of consumer loans.  Previously, this Court found that a review of the excerpts from VantageScore's website revealed that the purpose behind VantageScore's scoring model is developing a statistically sound, and therefore reliable and accurate, prediction of a consumer's credit risk or creditworthiness, which is in complete accord with the purpose of the FCRA—to ensure accuracy and fairness in credit reporting.  15 U.S.C. §1681.  *See* discussion *supra* at 50.  With regard to the excerpt from the VantageScore Fact Sheet, the statements are not directed to any

particular persons or entities, and thus, cannot be used to show concerted action or a "meeting of the minds" between Defendants. In addition, there is no indication of when these statements first appeared, and therefore, Plaintiff has not established that they preceded the decision to reduce her credit limit. At best, the information provided on the VantageScore Fact Sheet constitutes a one-way communication from VantageScore to potential clients—banks, credit card companies, and other lenders—recommending certain uses of VantageScore®. Moreover, VantageScore's website does not instruct potential clients to use its VantageScore® exclusively to set loan prices. Absent such instruction, the excerpted material on the VantageScore Fact Sheet does not provide either direct or circumstantial evidence that the banks, credit card companies, and other lenders entered into an agreement to use the credit scores to fix credit at a certain price. *See* discussion *supra* at 30-31.

Thus, for these and the reasons set forth above with regard to the Lender Defendants', Bureau Defendants', and FICO's motions to dismiss, the Court finds Plaintiff has failed to state a plausible §1 claim against VantageScore. Therefore, the Court recommends that the Complaint as to VantageScore be dismissed with prejudice.[58]

## III.    CONCLUSION

For the reasons set forth above, it is respectfully recommended that the Motion of Defendants JP Morgan Chase & Co. and Bank of America Corporation to Dismiss the Complaint (ECF No. 32) be granted with prejudice. It is further recommended that the Motion of Defendant

---

[58] In the alternative, Plaintiff summarily requests leave to amend her complaint. (Pl's Mem. in Opp'n to VantageScore at 11, ECF No. 64.) The Court recommends that Plaintiff's request be denied for the same reasons set forth with regard to the same request in her briefs in opposition to the motions to dismiss filed by the Lender Defendants and Bureau Defendants. *See* discussion *supra* at 51-53, 70.

Fair Isaac Corporation to Dismiss the Complaint (ECF No. 36) be granted with prejudice. It is further recommended that the Motion of Defendant VantageScore Solutions LLC to Dismiss the Complaint (ECF No. 39) be granted with prejudice. It is further recommended that the Motion of Defendants Trans Union, Experian and Equifax to Dismiss the Complaint (ECF No. 42) be granted with prejudice.

In addition, although not separately filed, Plaintiff requested leave to file an amended complaint in her opposition briefs to each of the above motions. It is respectfully recommended that those requests be denied. It is further recommended that Plaintiff's request for jurisdictional discovery, lodged in her opposition brief to VantageScore Solutions LLC's motion to dismiss, also be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of service of this Report and Recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: August 10, 2011                        BY THE COURT:


                                              __/s/ Lisa Pupo Lenihan_____
                                              LISA PUPO LENIHAN
                                              Chief U.S. Magistrate Judge


cc:     All Counsel of Record
        *Via Electronic Mail*